[No. 60222-1. En Banc. May 26, 1994.]

WILLIAM WEYERHAEUSER, ET AL, *Respondents*, v. PIERCE COUNTY, ET AL, *Appellants*.

28

*Eisenhower & Carlson,* by *Charles K. Douthwaite, Special Deputy Prosecuting Attorney,* for appellant Pierce County.

*Heller, Ehrman, White & McAuliffe,* by *Daniel D. Syrdal* and *Polly L. McNeill,* for appellants Land Recovery, et al.

*Gordon, Thomas, Honeywell, Malanca, Peterson & Daheim,* by *William T. Lynn* and *Annette Thompson,* for respondents.

BRACHTENBACH, J. — This is an appeal from a superior court decision invalidating a conditional use permit for a sanitary landfill project in Pierce County. The trial court held that the hearing examiner denied Respondents Weyer-

haeusers the right to confront and examine county staff members in violation of Pierce County Code 2.36.090 and due process, and that the hearing examiner's findings of fact, conclusions of law, and decision are inadequate as a matter of law. We agree that the ordinance requires cross examination of the county staff, and that the findings, conclusions, and decision are inadequate. We further hold that the environmental impact statement for the project is inadequate as a matter of law, that the project is in sufficient conformance with the Pierce County Comprehensive Land Use Plan, and that the Tacoma-Pierce County Solid Waste Management Plan contains mandatory criteria which must be met, but this record does not establish whether those criteria have been met. We affirm the trial court.

In 1989 appellants, Land Recovery, Inc. and Resource Investments, Inc. (LRI), applied to Pierce County for a conditional use permit to construct a municipal solid waste landfill on 317 acres at 304th and Meridian in unincorporated Pierce County about 15 miles south of Puyallup. The disposal site is adjacent to Respondents William and Gail Weyerhaeusers' land.

LRI has handled Pierce County collection and disposal of solid waste for many years, including operation of the Hidden Valley Landfill in Pierce County, which is expected to reach capacity in 1996. In 1986, pursuant to a contract between LRI and the Tacoma-Pierce County Health Authority, LRI began looking for a new solid waste disposal site, and in time began the permitting process at the 304th Street site.

Portions of the site lie within a 100-year floodplain. There are about 70 acres of wetlands on the site. The project calls for cutting and filling about 30 acres of the wetlands, with creation of replacement wetlands elsewhere on the site. The site has a fish-bearing stream which empties into the Nisqually River, and which LRI proposes to relocate in the future as actual disposal of wastes on the land expands by "cells". There are numerous wells around the site; well water is the only drinking water source for residents in the area.

On September 18, 1990, the County issued a draft environmental impact statement (DEIS) in connection with the project. The DEIS was generally favorable to the project. It generated considerable comment. A final EIS was issued by the County on November 28, 1990. The Weyerhaeusers and others appealed the adequacy of the final environmental impact statement (hereafter EIS) issued by the County. Beginning December 4, 1990, a public hearing was held on the EIS appeal and the conditional use permit application. The hearing examiner ruled that county staff members would not be subject to examination by the parties, but that written questions could be submitted to the County (not individual staff members) and the questions and answers deemed relevant by the hearing examiner would be made part of the record. The Weyerhaeusers and others objected to this procedure, arguing they had a right to confront and examine the staff.

The hearing was then continued to allow the EIS appeal period to expire, and was reopened for testimony on January 29, 1991. On that day, the Pierce County Planning and Natural Resources Department, which reviewed the permit application, issued a staff report to the hearing examiner. Ex. 1(a). Nine evenings were devoted to the hearing. The Weyerhaeusers and LRI submitted written questions to the County, and both presented expert witnesses, most of whom were cross-examined. Many members of the public spoke at the hearing, generally opposing the project.

On April 10, 1991, the hearing examiner released a report and decision approving the conditional use permit application, subject to conditions, and dismissing the EIS appeals. He found that the staff report "accurately sets forth the issues, general findings of fact, and applicable policies and provisions in this matter . . . and is incorporated into this report [report and decision of the hearing examiner] by reference as set forth in full herein". Hearing Examiner Decision, case CP 8-89, finding of fact 3. Among conditions imposed were all the mitigation measures identified in the EIS.

The decision was appealed to the county council, which remanded to the hearing examiner for additional findings on several issues. The hearing was reopened. On January 31, 1992, the hearing examiner released a report and decision on remand, including additional findings and conclusions, and again approving the permit application subject to conditions.

The county council then resumed its hearing on the appeals on April 13, 1992, and approved the hearing examiner's decisions and denied the EIS appeals. The council thereafter denied a motion for reconsideration. The Weyerhaeusers petitioned Pierce County Superior Court for a writ of review. The trial court entered a judgment on February 12, 1993, reversing the issuance of the conditional use permit and the dismissal of the Weyerhaeusers' EIS appeal.

LRI and Pierce County then sought direct review by this court, which was granted. They first argue that the trial court erred in holding that the Weyerhaeusers have the right to orally cross-examine the county staff members who prepared the EIS and the staff report considered by the hearing examiner. They maintain the hearing examiner properly limited the Weyerhaeusers to written questions of the County as an entity.

The hearing examiner limited cross examination to expert witnesses who orally testified, and ruled that "[q]uestions on areas covered by the Pierce County Planning Department shall be submitted to the Hearing Examiner in writing and will be answered in writing and made a part of the visual record if the question is deemed on that [which] is relevant." Transcript of Proceedings (Dec. 4, 1990), at 19. The hearing examiner gave as the reasoning for this procedure the time needed by county staff to prepare answers to complex questions.

The trial court held that this method of questioning the county staff violated Pierce County Code (PCC) 2.36.090 and due process. The Weyerhaeusers also argue that the procedure violates the appearance of fairness doctrine. Because

we decide this issue on the basis that oral cross examination of the county staff is required under PCC 2.36.090, we do not address the due process and appearance of fairness doctrine arguments. In light of the local ordinances, this is not a case where we need to examine the extent of procedural rights afforded in a quasi-judicial administrative hearing in the absence of such ordinances. Similarly, we do not here decide whether cross examination is required under the State Environmental Policy Act of 1971 (SEPA).

Pierce County Code 2.36.090 provides that in a hearing

> The Examiner shall have the power to prescribe rules and regulations for the conduct of hearings before the Examiner; and also to issue summons for and compel the appearance of witnesses . . .. The privilege of cross-examination of witnesses shall be accorded all interested parties or their counsel in accordance with the rules of the Examiner.

This ordinance must be read in conjunction with PCC 2.36.010, which recognizes that one purpose of the Pierce County Hearing Examiner Code is "to ensure and expand the principles of fairness and due process in public hearings . . .". Thus, the code emphasizes *expanded* principles of fairness in public hearings, and the nature of cross examination required under PCC 2.36.090 must be determined in light of that express purpose.

LRI argues the hearing examiner's rule providing for only written cross examination of staff is authorized by the ordinance, as it states the right of confrontation is a "privilege", cross examination may only be made of "witnesses", and then only in accord with rules prescribed by the hearing examiner.

Regardless of whether the cross examination required by the ordinance is termed a "right" or a "privilege" under the ordinance, the ordinance provides that cross examination *shall* be accorded the interested parties. The first distinction drawn by LRI is irrelevant.

The second question is whether county staff were "witnesses" who could be cross-examined. LRI states that with one exception, none of the county staff were called to give

oral testimony. We first note that the ordinance authorizes the hearing examiner to "issue summons for and compel the appearance of witnesses", and that there is no reason that county staff members could not be called to give oral testimony. Further, the county staff were responsible for the preparation of two documents which have been critical to the hearing examiner's ultimate decisions, the EIS, which was directly at issue, and the staff report, which the hearing examiner incorporated by reference into his findings, conclusions, and decision.

We conclude that the county staff members who prepared the documents must be deemed witnesses within the meaning of the ordinance. In *Goldberg v. Kelly*, 397 U.S. 254, 25 L. Ed. 2d 287, 90 S. Ct. 1011 (1970), investigators who prepared written reports which were submitted recommending termination of welfare benefits were considered to be adverse witnesses subject to cross examination. Similarly, here the county staff authored written materials which were favorable to the granting of the conditional use permit. Merely because the information which was provided is written does not immunize the authors from being "witnesses" subject to cross examination under PCC 2.36.090. Of crucial importance, although LRI and the County strenuously argue that the County is a "neutral" party to this proceeding, the County has a direct interest in these proceedings sufficiently adverse to the Weyerhaeusers such that the county staff authors of the EIS and the staff report should be considered witnesses subject to cross examination within the meaning of the ordinance. As discussed below, the County has a huge stake in the outcome of these proceedings because the County has the ultimate responsibility for the collection and disposal of solid waste. It is no surprise that the *County* appealed from the trial court's decision.

Moreover, there is no question but that the accuracy and truthfulness of the information in the EIS is of paramount importance to the ultimate approval or disapproval of the landfill project and the issuance of the conditional use permit. There may be significant risks to the environment

and drinking water from this project which is designed to be operational for 30 to 50 years and then to serve as a permanent storage site. Cross examination of the preparers of the EIS is part and parcel of the testing of the information in the EIS.

Next, returning to our focus at the outset of this discussion, the code itself strongly emphasizes fairness. Under the circumstances of this case, where the County has an interest adverse to the Weyerhaeusers, written questions asked of the County simply do not satisfy the code's requirement of fairness in procedures. Oral cross examination can be used to test credibility, and can be shaped to elicit and develop testimony as the cross examination progresses. In contrast, the written question procedure employed by the hearing examiner satisfied neither of these purposes of cross examination. It is no small matter, too, that the County's answers to the written questions contained citations to legal authority. Carefully drafted written answers devised with the apparent assistance of counsel are not the kind of responses we associate with full and fair cross examination where the County has an interest at stake. We do not wish to impugn the integrity of any individual staff member, and do not do so. The questions were submitted to the County, and could not, under the hearing examiner's rules, be directed to any particular staff person. Nor do we presume any impropriety on the County's part. However, the method employed at the hearing does not comport with the fairness requirement of PCC 2.36.010.

We conclude that under the circumstances of this case, PCC 2.36.090 requires that the Weyerhaeusers be permitted oral cross examination of the county staff who wrote the staff report and the EIS. We reject the argument by LRI and the County that the hearing examiner had the authority to limit cross examination to written questions under that part of PCC 2.36.090 which says that cross examination shall be accorded "in accordance with the rules of the [hearing] Examiner." We do not identify the parameters of that authorization. Whatever else it may mean, however, that

language cannot mean something less than cross examination which satisfies principles of fairness. Here, no less than oral cross examination will serve that purpose.

We therefore affirm the trial court's holding that the opportunity for oral cross examination of the county staff must be accorded the Weyerhaeusers.

The trial court held that the hearing examiner's report and decision and the report and decision on remand did not set forth findings of fact, but instead recited conclusory statements and conclusions of law which do not establish the bases for the decision or the process by which the examiner resolved disputed facts. The court said that the decision documents did not provide enough information for the court to determine whether the required review of legal issues was made or whether findings were supported by substantial evidence. The trial court held the decision documents are inadequate as a matter of law, and this constitutes an independent basis for its reversal of the County's actions.

Under PCC 2.36.100, the hearing examiner was required to make and enter findings and conclusions which supported his decision, and which "set forth and demonstrate[d] the manner in which the decision or recommendation carries out and helps to implement the goals and policies of the Comprehensive Plan and the standards set forth in the various land use regulatory codes." PCC 18.10.630(F)(7) requires "findings and decision as provided by law".

██ "Findings of fact by an administrative agency are subject to the same requirement as are findings of fact drawn by a trial court." *State ex rel. Bohon v. Department of Pub. Serv.*, 6 Wn.2d 676, 694, 108 P.2d 663 (1940); *State ex rel. Duvall v. City Coun.*, 64 Wn.2d 598, 602, 392 P.2d 1003 (1964). The purpose of findings of fact is to ensure that the decisionmaker "has dealt fully and properly with all the issues in the case before he [or she] decides it and so that the parties involved" and the appellate court "may be fully informed as to the bases of his [or her] decision when it is made." (Quotation marks and citations omitted.) *In re*

*LaBelle*, 107 Wn.2d 196, 218-19, 728 P.2d 138 (1986). Findings must be made on matters "which establish the existence or nonexistence of determinative factual matters . . .". *In re LaBelle*, at 219. The process used by the decisionmaker should be revealed by findings of fact and conclusions of law. *Hayden v. Port Townsend*, 28 Wn. App. 192, 622 P.2d 1291 (1981). Statements of the positions of the parties, and a summary of the evidence presented, with findings which consist of general conclusions drawn from an "indefinite, uncertain, undeterminative narration of general conditions and events", are not adequate. *State ex rel. Bohon*, at 695.

The bulk of the hearing examiner's decision documents consists of summarizing evidence presented, without any guidance as to how issues involving disputed evidence were resolved by the hearing examiner. For example, one important issue is whether the proposed landfill project is a public or private project. The sole "finding" on the issue is: "The proposal advanced by the applicant is for a private project as defined by WAC 197-11-440(d) [*sic*, should be 197-11-780]." Hearing Examiner Decision, case CP 8-89, finding of fact 14. The exact same sentence is then repeated as a conclusion of law. Hearing Examiner Decision, case CP 8-89, conclusion of law 3. Another crucial issue is whether the EIS adequately discusses alternatives to the proposed project. Findings include: "Based upon the evidence presented, it appears that the environmental evaluation of the Planning Division is adequate." Hearing Examiner Decision, case CP 8-89, finding of fact 2. "All Pierce County policies, state statutes and regulations are being met . . .." Hearing Examiner Decision, case CP 8-89, finding of fact 13. As a conclusion of law, the hearing examiner concluded: "The Environmental Impact Statement filed as a final EIS is adequate." Hearing Examiner Decision, case CP 8-89, conclusion of law 4.

The findings and conclusions are clearly inadequate to determine the basis for the hearing examiner's decision upholding the adequacy of the EIS. While a finding recites that the project is a private project, there is no clue as to the basis for that conclusion. There is also no way to tell how the

hearing examiner concluded the EIS was adequate — he never addressed whether the EIS contains a proper discussion of alternatives to the proposed site, as required, yet that issue involves a major challenge to the adequacy of the EIS.

Additional findings of fact which are inadequate are discussed below with regard to whether the landfill project must conform to the Tacoma-Pierce County Solid Waste Management Plan.

We agree with the trial court that the findings and conclusions are inadequate as a matter of law. The parties dispute whether this conclusion requires that the decision be reversed, or whether remand for correction of errors is appropriate. However, this case involves more than just inadequate findings and conclusions. We have held that the opportunity for oral cross examination of the county staff must be provided, and, as explained below, additional errors of law require reversal of the decision.

LRI and the Weyerhaeusers urge the court to reach certain substantive issues. The County maintains the Weyerhaeusers did not cross-appeal, and therefore the Weyerhaeusers improperly addressed the substantive issues in their respondents' brief. However, LRI, which did appeal, raised the issues in its brief, and the Weyerhaeusers were entitled to respond. *See* RAP 10.3(b).

The trial court did not reach the substantive issues, on the basis that the hearing examiner's findings and conclusions and decision were inadequate to permit review. However, we reach the issues because they may be decided as a matter of law despite the inadequacy of the findings and conclusions.

 The first substantive issue raised by LRI concerns the adequacy of the final EIS. The adequacy of an EIS is a question of law subject to de novo review. *Klickitat Cy. Citizens Against Imported Waste v. Klickitat Cy.*, 122 Wn.2d 619, 632, 860 P.2d 390 (1993); *Citizens for Clean Air v. Spokane*, 114 Wn.2d 20, 34, 785 P.2d 447 (1990); *Barrie v. Kitsap Cy.*, 93 Wn.2d 843, 854, 613 P.2d 1148 (1980); *Leschi Imp. Coun. v. State Hwy. Comm'n*, 84 Wn.2d 271, 285, 525

P.2d 774, 804 P.2d 1 (1974). EIS adequacy involves the legal sufficiency of the data in the EIS. *Klickitat Cy.*, at 633 (citing Richard L. Settle, *The Washington State Environmental Policy Act: A Legal and Policy Analysis* § 14(a)(i) (4th ed. 1993)). Adequacy is assessed under the "rule of reason", *Klickitat Cy.*, at 633, which requires a " 'reasonably thorough discussion of the significant aspects of the probable environmental consequences' of the agency's decision." *Klickitat Cy.*, at 633 (quoting *Cheney v. Mountlake Terrace*, 87 Wn.2d 338, 344-45, 552 P.2d 184 (1976)). The court will give the agency determination substantial weight. RCW 43.21C.090.

The adequacy issue raised at this time is whether the EIS contains sufficient discussion of alternatives to the proposed project. RCW 43.21C.030 requires that an EIS contain a detailed discussion of alternatives to the proposed action. The required discussion of alternatives to a proposed project is of major importance, because it provides a basis for a reasoned decision among alternatives having differing environmental impacts. Pursuant to WAC 197-11-440(5)(b), the reasonable alternatives which must be considered are those which could "feasibly attain or approximate a proposal's objectives, but at a lower environmental cost or decreased level of environmental degradation".

Under the present statutes and administrative code, the question now before the court as to whether the EIS is adequate turns on whether the proposed project is a "public project" or a "private project".[1]

WAC 197-11-440(5)(d) provides in relevant part:

> When a proposal is for a private project on a specific site, the lead agency shall be required to evaluate only the no action alternative plus other reasonable alternatives for achieving the proposal's objective *on the same site. . . .*

(Italics ours.) A "private project" is defined in WAC 197-11--780: " 'Private project' means any proposal primarily ini-

---

[1]It is unnecessary in this case to determine whether the "public"/"private" distinction drawn in the administrative code accords with SEPA policy. We recognize that one commentator has suggested that in certain cases, the distinction may be unsound. *See* Richard L. Settle, *The Washington State Environmental Policy Act: A Legal and Policy Analysis* § 14(b)(ii) (4th ed. 1993).

tiated or sponsored by an individual or entity other than an agency."

Thus, if the project is a private project, the EIS need only contain a sufficient discussion of onsite alternatives and the no-action alternative, while if the project is a public project, the EIS must contain a discussion of offsite alternatives. Assessing the adequacy of the discussion of alternatives in the EIS thus requires a determination of whether the project is a private project, as LRI maintains, or a public project, as the Weyerhaeusers maintain.

We agree with the Weyerhaeusers that, as a matter of law, the proposed landfill is a public project, and the EIS must contain a sufficient discussion of offsite alternative proposals. Because it does not do so, it is inadequate as a matter of law.

LRI asserts it initiated and sponsored the project — investigating and selecting the site, applying for permits, making project decisions, and using its own money to do so. LRI states that the landfill site was purchased privately by an affiliated company.

According to testimony, however, a 1986 contract between LRI and the Tacoma-Pierce County Health Authority required LRI to seek to permit a new "in-county landfill to replace the Hidden Valley Landfill and/or a waste to energy facility". Transcript of Proceedings (Jan. 29, 1991), at 33. Also, the project is described as a "municipal solid waste facility", e.g., Ex. 1(i) (first page) (final EIS, letter from Pierce County Planning and Natural Resource Management Director). The record contains numerous such references.

There has been a longstanding relationship between the County and LRI for handling and disposing of solid waste. The County asked three garbage haulers to form a corporation (LRI), and subsequently turned over to that corporation the operation of the "whole Pierce County solid waste system . . .". Transcript of Proceedings (Jan. 29, 1991), at 33. The County by ordinance approved LRI's budget for 1990, including $150,000 for permitting at the 304th Street site. Transcript of Proceedings (Feb. 5, 1991), at 325-29; Ex. 34, schedule 9.

We think it clear that the County has been involved in the initiation of the landfill project, regardless that it has done so through contracting out aspects of waste collection and disposal.

■■ Our holding that the project is a public project is based on other grounds, however. The handling and disposal of solid waste is a governmental function. RCW 70.95.020 provides that while private entities may contract with local government for solid waste handling, the primary responsibility is that of the local government. In several cases, Washington courts have characterized garbage handling and landfills as governmental functions. *E.g., Citizens for Clean Air v. Spokane,* 114 Wn.2d 20, 39, 785 P.2d 447 (1990) ("[d]isposal of solid waste is a recognized governmental function"; therefore, contract with private company for disposal of solid waste is not an unconstitutional gift of public moneys); *King Cy. v. Algona,* 101 Wn.2d 789, 681 P.2d 1281 (1984) (disposal of solid waste is a governmental function and, therefore, absent express statutory authority a municipality may not tax a county's solid waste transfer station); *Shaw Disposal, Inc. v. Auburn,* 15 Wn. App. 65, 546 P.2d 1236 (1976). In *Shaw,* the court held that code cities were not required under a bidding statute to let garbage contracts to the lowest responsible bidder. The court then said that there was good reason for the lack of any such requirement:

> The accumulation of garbage and trash within a city is deleterious to public health and safety. The collection and disposal of garbage and trash by the city constitutes a valid exercise of police power and a governmental function which the city may exercise in all reasonable ways to guard the public health. It may elect to collect and dispose of the garbage itself or it may grant exclusive collection and disposal privileges to one or more persons by contract, or it may permit private collectors to make private contracts with private citizens. The gathering of garbage and trash is considered to be a matter which public agencies are authorized to pursue by the best means in their possession to protect the public health . . . .

*Shaw,* at 68 (quoting *Davis v. Santa Ana,* 108 Cal. App. 2d 669, 676, 239 P.2d 656 (1952)).

Thus, regardless of whether the County deals with a private company, the collection and disposal of solid waste is the County's responsibility.

Under LRI's argument a government agency could avoid the requirement of environmental consideration of alternative sites and the comparison with a proposed project which that entails simply by contracting with a private entity to carry out the project. While it is true that LRI cannot condemn alternative sites, the County can. *See* RCW 8.08.010; RCW 36.58.010.

The EIS therefore must contain a sufficient discussion of offsite alternatives. It plainly does not.

 Not all potential alternatives must be examined. *Solid Waste Alternative Proponents v. Okanogan Cy.*, 66 Wn. App. 439, 443, 445, 832 P.2d 503, *review denied*, 120 Wn.2d 1012 (1992). Adequacy is determined under the "rule of reason". *Barrie v. Kitsap Cy.*, 93 Wn.2d 843, 854, 613 P.2d 1148 (1980). There must be a reasonably detailed analysis of a reasonable number and range of alternatives. Richard L. Settle, *The Washington State Environmental Policy Act: A Legal and Policy Analysis* § 14(b)(ii) (4th ed. 1993). Under WAC 197-11-440(5)(c), the alternatives section of the EIS must describe the objectives, proponents and principal features of reasonable alternatives, including the proposed action with any mitigation measures; describe the location of alternatives, including a map, street address and legal description; identify phases of the proposal; tailor the level of description to the significance of environmental impacts; devote sufficiently detailed analysis to each alternative so as to permit a comparison of the alternatives; present a comparison of the environmental impacts of the alternatives; and discuss benefits and disadvantages of reserving implementation of the proposal to a future time.

LRI claims it has complied with these requirements, and cites the final EIS at pages 19 to 33 (Ex. 1(c)) as containing sufficient discussion of offsite alternatives. However, pages 19 to 33 of the final EIS do not contain the required discussion. Instead, those pages contain a discussion of LRI's site

selection process, and the brief descriptions of rejected sites consist of conclusory statements of LRI's assessment of possible sites examined in the site selection process.[2] They do not contain any location information such as a map, street address, and legal description. They do not contain any description of principal features of any alternatives. They do not tailor the level of description to the significance of environmental impacts, and, in fact, it is impossible from the brief, conclusory descriptions to engage in any meaningful comparison of the alternatives. There is absolutely no useful comparison of the environmental impacts of the alternatives.

The EIS format is telling as to whether these descriptions were ever intended to be a discussion of alternative proposals. They are in a section titled "Site Selection", beginning at page 19. Ex. 1(c), at 19. A "Description of Alternatives, Including the Proposal" begins on page 33 of the EIS. Ex. 1(c), at 33. The latter section contains some discussion of onsite alternatives, but no discussion of offsite alternatives.

Because the EIS completely fails to discuss any offsite alternatives, it is inadequate as a matter of law. The EIS must be revised to contain a discussion of alternative sites. *Barrie*, 93 Wn.2d at 857. The trial court's invalidation of the conditional use permit must be upheld in light of the inadequate EIS.

Next, LRI and the Weyerhaeusers argue about whether the proposed landfill project must comply with the Pierce County Comprehensive Land Use Plan, and, if so, whether it does.

Pierce County's comprehensive plan calls for the proposed site to be "Rural-Residential" with a recommendation for "low-density residential use". The parties do not dispute that

---

[2]For example, one description follows:

"Another site near Dupont was considered as a potential alternative location. The cost and effort to assemble a parcel large enough for the landfill, however, made this site impracticable. It would have involved purchasing a large number of small parcels to compile the requisite acreage. In addition, the area was planned for relatively dense residential development that may not have been compatible with the landfill. The soils here were also substantially more permeable, reducing the natural groundwater protection afforded by the proposed site." Ex. 1(c), at 29.

the property is zoned "G". Under this classification, a landfill is a permitted use. PCC 18.10.390(B)(2).

Generally, a specific zoning ordinance will prevail, even over an inconsistent comprehensive plan. *Cougar Mt. Assocs. v. King Cy.*, 111 Wn.2d 742, 757, 765 P.2d 264 (1988); *Nagatani Bros., Inc. v. Skagit Cy. Bd. of Comm'rs*, 108 Wn.2d 477, 480, 739 P.2d 696 (1987). Thus, to the extent the comprehensive plan prohibits the landfill use, while the zoning code permits it, the use would be a permitted use under this general rule.

However, the zoning code itself expressly requires that "[s]olid waste facilities that require a Solid Waste Permit shall indicate on a site plan that the facility *meets . . .* any comprehensive land use plan". (Italics ours.) PCC 18.10.560. Thus, for landfills, the zoning code requires consistency with the comprehensive plan. LRI maintains the landfill is consistent with the "Rural-Residential" designation. The Weyerhaeusers argue that a landfill is not consistent with the "Rural-Residential" designation, and therefore PCC 18.10.560 prohibits siting of a landfill at the proposed site.

The comprehensive plan states that it "deals with policy concerning broad categories and extensive areas of land use. It is conceptual and predictive in nature, being based on an estimate of future land requirements." Clerk's Papers, at 65. It says that

[l]ow density residential use is recommended in these areas to:

(1) Avoid premature and uneconomic extension of public facilities and services

(2) To reserve potential residential land in sufficiently large ownership parcels to permit proper subdivision at a future date.

(3) To provide areas within reasonable commuting distance of major employment centers where rural living can be enjoyed with a minimum of use restrictions.

Clerk's Papers, at 78.

The Pierce County Comprehensive Land Use Plan, which is a brief document, was written in 1962, and, as characterized in the plan itself, is concerned with broad categories and is conceptual in nature. The recommenda-

tions for the rural-residential designation identified in the staff report emphasize reserving space for later development and providing rural living space. We agree that a landfill is not a residential use, but the extremely broad nature of the comprehensive plan, the broad purposes of the "rural-residential" designation, and the notion that landfills must be sited somewhere lead us to the conclusion that a landfill at the 304th and Meridian site is not so incompatible with the rural-residential designation as to be proscribed by the comprehensive plan. " '[A] comprehensive plan is no more than a general policy guide . . ..' " *Cougar Mt. Assocs. v. King Cy., supra* at 757 (quoting *Carlson v. Beaux Arts Village*, 41 Wn. App. 402, 408, 704 P.2d 663, *review denied*, 104 Wn.2d 1020 (1985)).

The next issue is whether the proposed landfill project must comply with the Tacoma-Pierce County Solid Waste Management Plan (SWMP), and, if so, whether it does.

RCW 70.95.080 requires that each county have a comprehensive solid waste management plan. RCW 70.95.090(9) requires that the plan contain a review of potential areas that meet the state's siting criteria. RCW 70.95.185 and .190 require that both the Department of Ecology and the Department of Health find that the project "conforms" to the SWMP.

The SWMP explains its format, Ex. 1(i), at 2-21, stating that after a discussion of each of the locational standards and local siting issues, a summary review of exclusionary criteria identified in the discussion will follow.

> Exclusionary criteria, sometimes called "fatal flaw criteria[,]" are those factors that would definitively eliminate an area from any consideration for a waste disposal site. Fatal flaws include restrictions placed on siting by regulations or by local ordinances. They can also be defined by the local governing body or by enforceable plans such as the solid waste management plan.

Ex. 1(i), SWMP at 2-21.

PCC 18.10.560 provides that "[s]olid waste facilities that require a Solid Waste Permit shall indicate on a site plan that the facility meets the . . . Solid Waste Plan". PCC

18.10.560. Similar to the question of compliance with the comprehensive plan, discussed above, this provision mandates compliance with the SWMP.

Thus, both the SWMP itself and the Pierce County Zoning Code mandate the project's compliance with the SWMP.

The hearing examiner's conclusion that the SWMP is only a guideline is thus contrary to law, and must be reversed. The Weyerhaeusers argue that application of the wrong legal standard is fatal, and that it is not possible to know how the hearing examiner would have decided the case had the hearing examiner treated the SWMP provisions as determinative rather than as guidelines. LRI maintains, to the contrary, that even if the SWMP is mandatory, rather than merely a guideline as the hearing examiner concluded, the hearing examiner properly found the project conforms to the SWMP.

We agree with the Weyerhaeusers. There is a fundamental difference between a mere guideline and mandatory criteria, and we are not prepared to say that the difference had no effect on the hearing examiner's findings, conclusions, and decision.

Moreover, we disagree with LRI's characterization of the findings which were entered. The findings upon which LRI relies for the proposition that the hearing examiner properly found compliance with the SWMP do not support that proposition.

Several of the criteria in the SWMP have been the subject of dispute in this case; compliance with the SWMP is a major issue. Some areas of dispute, for example, have involved whether the project is impermissibly sited within 200 feet of a stream, whether it is impermissibly sited on wetlands, and whether it is impermissibly sited on a sole-source aquifer. One mandatory SWMP criteria provides that "[n]o facility's active area shall be located within two hundred feet measured horizontally, of a stream . . . nor in any wetland . . . .". Ex. 1(i), at 2-34. Another provides that "[n]o landfill shall be located over a sole source aquifer . . .". Ex. 1(i), at 2-24. There is no exception in the SWMP for

relocating either wetlands or streams which are subject to mandatory criteria.

LRI points to findings of fact 6, 7, 8, and 15 (on remand). These findings are as follows:

6. The project as planned is consistent with the solid waste management plan and meeting the public need criteria.

7. An initial regional study of sites was conducted by the applicant as required by the Tacoma Pierce County Solid Waste Management Plan.

8. The project site was subjected to the site specific criteria listed in the SWMP.

. . . .

15. The proposed site does not fail to meet the siting requirements of the Pierce County Solid Waste Management Plan.

Hearing Examiner Decision on Remand, case CP 8-89, findings of fact 6, 7, 8, and 15.

There must be findings on matters which "establish the existence or nonexistence of determinative factual matters . . .". *In re LaBelle*, 107 Wn.2d 196, 219, 728 P.2d 138 (1986). None of these findings gives any indication of the decision-maker's resolution of whether the active area of the site is within 200 feet of a stream, whether it is located on wetlands, or whether it is over a sole-source aquifer. Any of these conditions would be a "fatal flaw", and thus be a determinative factual matter. Like other findings discussed above, these findings are no more than conclusory statements.

LRI also suggests that finding of fact 14 (on remand) resolves the question whether the project is impermissibly sited on wetlands. That finding is that

[t]he various definitions of wetlands as contained in the minimum functional standards [MFS] versus the federal methodology, utilized by the Corps of Engineers, creates a condition requiring a permit to fill wetlands in question on the proposed site even though the wetlands do not meet the definition of wetlands as defined by the MFS.

Hearing Examiner Decision on Remand, case CP 8-89, finding of fact 14. LRI maintains that this finding establishes that although there are wetlands on the site under federal standards, there are no wetlands as defined by state law, *i.e.*, the MFS.

LRI misstates the finding. The finding does not say there are no wetlands as defined by state law on the site nor does it say that no part of the facility's active area is on wetlands as defined under the MFS. Plainly the finding is directed to whether there must be a permit in order for certain wetlands on the site to be filled; it says there are wetlands requiring a permit to be filled. The finding is completely silent as to whether there may be wetlands on the site which are wetlands within the meaning of the SWMP.[3]

Finally, conclusion of law 6 (on remand) completely destroys LRI's claim that there has been a definitive determination that there are no wetlands involved within the meaning of the term in the SWMP. The hearing examiner concluded in part that "[i]n the event of a future decision that the so-called wetlands are adjudged to meet the SWMP criteria the applicant may follow the procedure for obtaining a variance . . .".[4] Hearing Examiner Decision on Remand, conclusion of law 6. Thus, not only is there no finding stating that there are no wetlands as the term has meaning within the SWMP, there is in fact a conclusion of law indicating that the issue is still open.

In summary, we hold that the SWMP exclusionary criteria are mandatory, and the findings and conclusions fail to address adequately whether there has been compliance with those mandatory criteria.

## CONCLUSION

The hearing examiner's decisions on the conditional use permit and the EIS appeal are reversed. The EIS must be revised to adequately address alternatives to the proposed project. In any new public hearing on this proposed project where county-staff-authored reports and an environmental impact statement are involved, the opportunity for oral cross examination of the staff members must be accorded. The

---

[3]In addition, there has been no determination that only MFS-defined wetlands fall within the meaning of the term in the SWMP criteria.

[4]We caution that we do not decide the issue whether a variance from the SWMP criteria may be sought and granted.

project must be in compliance with the exclusionary (mandatory) criteria of the Tacoma-Pierce County Solid Waste Management Plan.

ANDERSEN, C.J., and UTTER, DOLLIVER, SMITH, GUY, and JOHNSON, JJ., concur.

MADSEN, J. (concurring in part, dissenting in part) — Because the majority would unjustifiably expand the notion of "fairness" far beyond any cross examination right previously accorded in a public hearing of this nature, I respectfully dissent with respect to this portion of its opinion. Contrary to time-honored rules of statutory construction, the majority tortures the Pierce County Hearing Examiner Code (the Code), Pierce County Code (PCC) ch. 2.36, to reach its dubious result. Then, claiming that a due process analysis is unnecessary to support its reading of the Code, the majority goes beyond the Code and asserts incorrectly that its conclusion is supported by due process case law, citing *Goldberg v. Kelly*, 397 U.S. 254, 25 L. Ed. 2d 287, 90 S. Ct. 1011 (1970). The majority then compounds the confusion by ignoring the fact that any consideration of the issue of cross examination outside the Code is inexorably tied to due process. The result of these machinations is to convert an already time-consuming public hearing procedure into an outright marathon.

First, PCC 2.36.090 contains a number of significant words and phrases, only one of which the majority gives effect in its analysis. PCC 2.36.090 reads:

> The Examiner shall have the power to prescribe rules and regulations for the conduct of hearings before the Examiner; and also to issue summons for and compel the appearance of witnesses, to administer oaths, and to preserve order. The privilege of cross-examination of witnesses shall be accorded all interested parties or their counsel in accordance with the rules of the Examiner.

Under longstanding rules of statutory construction, " 'a statute should be interpreted so as not to render one part inoperative". *Xieng v. Peoples Nat'l Bank*, 120 Wn.2d 512,

530, 844 P.2d 389 (1993) (quoting *Davis v. City & Cy. of San Francisco*, 976 F.2d 1536 (9th Cir. 1992) (quoting *South Carolina v. Catawba Indian Tribe, Inc.*, 476 U.S. 498, 510 n.22, 90 L. Ed. 2d 490, 106 S. Ct. 2039 (1986))). "[S]tatutes must be read in their entirety, not in a piecemeal fashion" and all the language used must be given effect. *Vaughn v. Chung*, 119 Wn.2d 273, 282, 830 P.2d 668 (1992); *In re Marriage of Timmons*, 94 Wn.2d 594, 600, 617 P.2d 1032 (1980). If unclear, words are to be given their "plain and ordinary meaning". *Cowiche Canyon Conservancy v. Bosley*, 118 Wn.2d 801, 813, 828 P.2d 549 (1992). "If the Legislative intent or meaning of a statute is unclear, the meaning of doubtful words may be determined through their relationship to associated words and phrases." *State v. Rice*, 120 Wn.2d 549, 560-61, 844 P.2d 416 (1993). Courts must not focus on individual words in a statute alone, but must consider the language of the statute as a whole, its underlying policies, and the language and underlying policies of the entire act of which it is part. *Vaughn*, at 282. Statutes are to be construed so as to effect their underlying purpose and avoid "unlikely, absurd or strained consequences". *Kadoranian v. Bellingham Police Dep't*, 119 Wn.2d 178, 189, 829 P.2d 1061 (1992) (quoting *State v. Fjermestad*, 114 Wn.2d 828, 835, 791 P.2d 897 (1990)).

By singling out the words "shall be accorded" as determinative of the issue of cross examination, the majority ignores these rules. When read as a whole, the ordinance cannot be construed to "require" cross examination of the county staff as the majority holds. PCC 2.36.090 first states that the examiner "shall have the power to prescribe rules and regulations for the conduct of hearings". This power is not limited in the ordinance. Then, PCC 2.36.090 states that the examiner "shall have the power . . . to issue summons for and compel the appearance of witnesses". This language does not require the examiner to compel the appearance of witnesses but only gives the examiner the power to do so. This statement also follows language giving the examiner the power to set up rules and regulations. The next sentence

says that the *"privilege* of cross-examination of *witnesses shall be accorded* all interested parties or their counsel *in accordance with the rules of the Examiner"*. (Italics mine.) PCC 2.36.090. While PCC 2.36.090 uses the phrase "shall be accorded", it is qualified in that any cross examination is "in accordance with the rules of the Examiner". Moreover, the sentence uses the word "privilege", not the word "right". The sentence further limits the privilege of cross examination to "witnesses".

While the ordinance does not define the word, "witness" is used primarily in reference to individuals testifying under oath before a judicial tribunal. Instead of adopting the common understanding of the term, the majority relies on less recognized definitions which include potential or proposed testifiers or those who provide evidence. *See* Black's Law Dictionary 1603-04 (6th ed. 1990); *Webster's Third New International Dictionary* 2627 (1986). However, when something beyond witnesses who testify is meant, a distinction usually will be made by either including the modifier "non-testifying" before the term witness or by discussing these individuals differently. *See, e.g., Pavlik v. United States*, 951 F.2d 220, 224 (9th Cir. 1991). The modifier is not used here, nor is any distinction made. Further, if the ordinance had intended that all individuals who could potentially provide adverse evidence must be called, as the majority asserts, it would "compel" rather than "empower" the hearing examiner to subpoena them.[5] Instead, the language when read as a whole supports the conclusion that the fact and manner of cross examination are to be determined by the hearing examiner and are not due as a matter of law. The majority's interpretation ignores the ordinary meaning of the term "witness" and would render the remaining language in the ordinance, other than "shall be accorded", inoperative.

---

[5] In fact, the provision does not give interested parties any right to subpoena or call witnesses. This omission works against the majority's conclusion as well because if the Code truly intended to "require" cross examination of all adverse individuals, it would have, at a minimum, contained language regarding such important issues.

Next, the majority cites only one of the professed purposes behind the Code to support its conclusion and ignores the remaining purposes which do not. PCC 2.36.010 recognizes:

A. The need to separate the County's land use regulatory function from its land use planning function;

B. The need to ensure and expand the principles of fairness and due process in public hearings; and

C. The need to provide an efficient and effective land use regulatory system which integrates the public hearing and decision-making processes for land use matters; it is the purpose of this chapter to provide an administrative land use regulatory system which will best satisfy these needs.

The resolution adopting the Code also states:

[T]he Board . . . believes that a land use hearing examiner system will be very beneficial to all concerned or involved with land use decisions, and said system will (1) provide a more efficient and effective land use decision procedure; (2) provide the Planning Commission more time to devote towards studying and recommending land use policy changes to the Board; (3) provide an experienced expert to hear and decide land use cases based upon policy adopted by the Board; and (4) provide the Board of County Commissioners more time to spend on other County concerns by relieving them from hearing land use cases, except any appeals . . .[.]

Pierce County Resolution 20489 (1978).

While the Code was intended to expand principles of fairness and due process in public hearings, it is an unwarranted conclusion that the Code intended that public hearings' procedures should be "expanded" to those of a regular trial. A public hearing is meant to be a different creature altogether and serve different purposes. "The purpose of the hearing may range from the determination of a specific past event . . . to an endeavor to ascertain community feeling about a proposed change in zoning or to determine the efficacy of a new drug." Henry J. Friendly, *Some Kind of Hearing*, 123 U. Pa. L. Rev. 1267, 1270-71, 1277-79 (1975). As Justice Frankfurter explained, "differences in the origin and function of administrative agencies 'preclude wholesale transplantation of the rules of procedure, trial, and review which have evolved from the history and experience of the courts' ". Friendly, at 1269. The term "hearing" may connote

a written rather than oral hearing or a different panoply of procedures in any given case. Friendly, at 1270-71.

Further, the Code also provides that in addition to its purpose to "expand" these principles, it intends "to provide an *efficient and effective* land use regulatory system". (Italics mine.) PCC 2.36.010. Without the county employees' testimony, the hearing took 10 days of testimony and arguments, not including the time the examiner needed for consideration and preparation of a decision. The hearing examiner took an additional day of testimony on remand. These numbers do not even account for the hours the planning department and other agencies spent considering the option and preparing the reports. Moreover, the County is required to prepare these advisory reports in a significant number of cases before the hearing examiner. *See* PCC 2.36.080. To require county employees to testify in each of these cases would unduly burden the planning department in performing its functions despite the intent of the Code to free the department up to do so. In short, the majority's decision today would, without any solid basis, ignore rules of statutory construction and undermine the Code's purpose in favor of its own construction. The majority's interpretation robs the examiner of his statutory discretion and the provision of its enacting purpose — to release the planning department from this part of the process. Without clear language in PCC 2.36.090, or elsewhere in the Code that such a procedure is required, I cannot agree with the majority's reading.

Secondly, the majority's analysis of whether cross examination is required in a particular case independent of the PCC is confusing, misleading, and incorrect. While the majority asserts that it need not reach the issue of due process, the question of required cross examination in civil hearings as a general matter is inextricably tied to such issues because the confrontation clause only applies to criminal proceedings. *See SEC v. Jerry T. O'Brien, Inc.*, 467 U.S. 735, 81 L. Ed. 2d 615, 104 S. Ct. 2720 (1984). When articulating its purposes, the Code itself incorporates the

issue of due process as well. The majority in fact acknowledges this when it cites *Goldberg*.

As a general rule, due process does not require the result advocated by the majority, despite what the majority attempts to imply. Adverse witnesses need not be compelled to testify in a civil hearing. *See, e.g., Thomas v. Baker*, 925 F.2d 1523, 1525-26 (D.C. Cir. 1991) (agency officer who wrote a recommendation). Moreover, "confrontation and cross-examination of those furnishing evidence against" an individual's position are not required in administrative hearings. *Wolff v. McDonell*, 418 U.S. 539, 567, 41 L. Ed. 2d 935, 94 S. Ct. 2963 (1974); *see also Pavlik*, 951 F.2d at 224-25 (agency investigator); *Chmela v. Department of Motor Vehicles*, 88 Wn.2d 385, 392-93, 561 P.2d 1085 (1977) (police report author); *Johnston v. Grays Harbor Cy. Bd. of Adj.*, 14 Wn. App. 378, 383-84, 541 P.2d 1232 (1975) (environmental impact statement author). Hearsay evidence can be used and relied upon in administrative hearings. *See* RCW 34.05.452(1); 2 Kenneth C. Davis & Richard J. Pierce, Jr., *Administrative Law Treatise* § 10.4 (3d ed. 1994); *Washington Administrative Law Practice Manual* § 9.09, at 9-57.0 through -57.1 (Richard A. Finnigan et al. eds. in chief 1992). Even courts which have held that in a given case, parties should be allowed to cross-examine authors of reports, have acknowledged that such a call is within the administrative judge's discretion and have limited their holdings to the facts. *See Demenech v. Secretary of Dep't of Health & Human Servs.*, 913 F.2d 882 (11th Cir. 1990); *Wallace v. Bowen*, 869 F.2d 187 (3d Cir. 1989); *but see Lidy v. Sullivan*, 911 F.2d 1075 (5th Cir. 1990), *cert. denied*, 114 L. Ed. 2d 725 (1991); *Coffin v. Sullivan*, 895 F.2d 1206 (8th Cir. 1990).[6] In a given administrative hearing, what is required by due process depends upon first identifying the interest protected by due process and then upon balancing the factors enumer-

---

[6]Highly regarded administrative commentators Davis and Pierce point out that these cases only rely on dicta in *Richardson v. Perales*, 402 U.S. 389, 28 L. Ed. 2d 842, 91 S. Ct. 1420 (1971), and argue against such a conclusion. 2 Kenneth C. Davis & Richard J. Pierce, Jr., *Administrative Law Treatise* § 9.11 (3d ed. 1994).

ated in *Mathews v. Eldridge*, 424 U.S. 319, 47 L. Ed. 2d 18, 96 S. Ct. 893 (1976).

To constitute a protected interest requiring due process protection, a government action must "constitute the impairment of some individual's life, liberty or property". 2 Ronald D. Rotunda & John E. Nowak, *Constitutional Law: Substance and Procedure* § 17.2 (2d ed. 1992). "Where government actions adversely affect an individual but do not constitute a denial of that individual's life, liberty or property, the government does not have to give the person any hearing or process whatsoever." Rotunda & Nowak § 17.2, at 581. The Supreme Court has given the phrase "life, liberty or property" restrictive meaning and no procedure is due unless an alleged interest falls within this meaning. Generally, liberty interests are derived from "those provisions of the Bill of Rights which the Court deems to be 'incorporated' into the due process clause as well as 'fundamental rights' which are derived either from the concept of liberty or other constitutional values". Rotunda & Nowak § 17.4, at 597. Property interests are derived from constitutional limitations on the government's ability to define or limit property rights such as the First Amendment, equal protection, and substantive due process. Rotunda & Nowak § 17.5. The majority cites no constitutionally protected interest in this case which would entitle the Weyerhaeusers to cross-examine adverse, nontestifying witnesses.[7]

When a protected interest exists, the procedural protections required by due process will still differ from case to case. *Mathews* states that which procedural safeguards are required in any hearing that would deprive any individual of a protected interest depends upon "consideration of three distinct factors":

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and

---

[7]Nor does the majority argue that PCC 2.36.090 itself creates due process protection. *See In re Cashaw*, 123 Wn.2d 138, 145, 866 P.2d 8 (1994); *Conard v. UW*, 119 Wn.2d 519, 529, 834 P.2d 17 (1992), *cert. denied*, 126 L. Ed. 2d 59 (1993).

finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Mathews*, at 335. The Court further noted that "[t]he judicial model of an evidentiary hearing is neither a required, nor even the most effective, method of decisionmaking in all circumstances". *Mathews*, at 348. "All that is necessary is that the procedures be tailored, in light of the decision to be made, to 'the capacities and circumstances of those who are to be heard,' to insure that they are given a meaningful opportunity to present their case." *Mathews*, at 349 (quoting *Goldberg*, 397 U.S. at 268-69).

Even if the protected interest problem could be overcome in this case, the *Mathews* analysis does not support the majority's result. First, the risk of erroneous deprivation and the probable value of allowing cross examination of county staff in this case are small because the reports at issue here could be effectively criticized without calling the county employees who wrote them. The Weyerhaeusers and others opposing the conditional use permit were able to call witnesses, present evidence to rebut the reports' recommendations, and cross-examine their opponents' expert witnesses. They also had an opportunity to ask county employees written questions. Lastly, the administrative burden adopting such a procedure would impose outweighs any small benefit. If such a procedure were to be imposed, county employees would have to testify in every case before the hearing examiner. Hearings would be significantly longer without much reason because the same or unnecessary information would be elicited. It would therefore be a great imposition on the County and the hearing process if county employees were to be subject to oral examination on these reports. Such a requirement could interfere with the County's performance of its functions and would be contrary to the articulated purposes for which the Code was enacted.

The facts and holding of *Mathews* itself also contradict the majority's reasoning. The Court held that even the decision to terminate protected disability benefits could be made

based completely on written submissions and written medical reports and did not require an evidentiary hearing. The Court stated that "while there may be 'professional disagreement with the medical conclusions' the 'specter of questionable credibility and veracity is not present.'" *Mathews*, at 344 (quoting *Richardson v. Perales*, 402 U.S. 389, 404, 28 L. Ed. 2d 842, 91 S. Ct. 1420 (1971)).

Instead of evaluating this issue in light of *Mathews*, the majority's holding implies that an unprotected interest would receive more procedural protection than a protected interest. It then erroneously cites *Goldberg* as supporting its position. First, in so doing, the majority ignores that *Goldberg* was uniquely tied to the protected interest at issue, the termination of welfare benefits, an interest quite unlike and far more important than any in debate here. Second, the majority fails to note that the Supreme Court has not said anything similar since that case and in fact, while not overruling it completely, has significantly limited its meaning in subsequent progeny. *See Mathews*, 424 U.S. at 333 ("In only one case, *Goldberg* v. *Kelly*, . . . has the Court held that a hearing closely approximating a judicial trial is necessary."); Davis & Pierce § 9.5, at 51 ("*Goldberg* is the only case in which a majority of the Court has held that due process requires an agency to provide a trial-type hearing before it takes an action that deprives an individual of an interest protected by due process.").

Finally, sound policy does not dictate the majority's result. Commentators have astutely pointed out that in administrative proceedings, cross examination yields little benefit and its main effect is more often delay. *See* Davis & Pierce § 9.5, at 48; Friendly, at 1283-86. Credibility attacks through cross examination are generally not very useful when a witness is an expert either. 1 Charles H. Koch, *Administrative Law and Practice* § 6.25 (1985). Davis & Pierce argue that requiring the confrontation and cross examination of report authors would actually cause administrative decisions to be less accurate. Davis & Pierce § 9.11.

In conclusion, without clear language in the ordinance, any holding that cross examination of the authors of adverse reports is required is not justified given the limited benefit, if any, such a procedure could yield and the costs such a procedure would entail. As the ordinance alludes, the decision as to the procedures merited under PCC 2.36.090 best rests with the hearing examiner. This conclusion comports both with the law and sound policy.

DURHAM, J., concurs with MADSEN, J.

Reconsideration denied September 27, 1994.