158 P.3d 1179 (2007)
SWINOMISH INDIAN TRIBAL COMMUNITY, a Federally Recognized Tribe, Appellant/Cross-Respondent,
v.
SKAGIT COUNTY, a Municipal Corporation, Respondent/Cross-Appellant.
No. 57813-8-I.
Court of Appeals of Washington, Division 1.
March 19, 2007.
Publication Ordered May 31, 2007.
Ann Elizabeth Tweedy, Kanji & Katzen, PLLC, John B. Arum, Seattle, WA, Stephen T. Lecuyer, Office of the Tribal Attorney, La Conner, WA, for Appellant/Cross-Respondent.
Joseph Perrine Mentor Jr., William W. Clarke, Jamie Michele Morin, Mentor Law Group PLLC, William W. Honea, Law Offices of William Honea, Sedro Woolley, WA, for Respondent/Cross-Appellant.
P. Stephen Dijulio, Jeffrey Burton Taraday, Foster Pepper PLLC, Seattle, WA, Ian Stuart Munce, City Attorney, Anacortes, *1180 WA, for Amicus Curiae on behalf of City of Anacortes.
Ryan Esq Vancil, Vancil Law Offices, PLLC, Bainbridge Island, WA, Amy Elizabeth Trainer, Friday Harbor, WA, Jill M. Olson, Seattle, WA, for Amicus Curiae on behalf of Washington Environmental Council.
BAKER, J.
¶ 1 The Swinomish Indian Tribal Community sought a declaratory judgment that provisions of the Growth Management Act (GMA) and a Memorandum of Agreement (MOA) between the Tribe, the County, and various other parties preclude the County from permitting water wells that adversely affect minimum instream water flows in the rivers and streams of Skagit basin, and an injunction requiring the County to abide by its statutory and contractual obligations. The superior court dismissed on the grounds that the Tribe lacks standing to seek interpretation and enforcement of the GMA in this manner, and that provisions of the MOA are contrary to public policy, and thus unenforceable.

I.
¶ 2 The Skagit River is the third largest river system in the United States. More than 3,000 rivers and streams flow into the Skagit River system, accounting for one-quarter of the fresh water flowing into Puget Sound. It is the only river in the lower 48 states that is home to all five species of Pacific salmon. The Swinomish Tribe has treaty rights to take fish from the Skagit River Basin.[1] Over the years, development in the Skagit Basin has led to declines in its salmon runs. One of the causes of the declining fish population is the reduction of stream flows necessary for spawning and migration.
¶ 3 In 1996, the Swinomish Tribe entered into an agreement with Skagit County regarding the allocation of Skagit River Basin water resources. In addition to the Tribe and County, the agreement also included Skagit County Public Utility District No.1, the City of Anacortes, the Department of Ecology, the Department of Fish and Wildlife, and the Upper Skagit and Sauk-Suiattle Tribes.
¶ 4 The MOA was intended in part to ensure the establishment of instream water flows to protect fisheries resources, to develop a coordinated water delivery system, and to reduce the use of exempt water wells in areas of the county experiencing inadequate instream flows as a result of groundwater withdrawal. An instream flow is defined in the MOA as the quantity of flow necessary to maintain sufficient water in a stream to support in harvestable numbers the natural production of food and game fish.
¶ 5 In a further provision of the MOA, the County agreed to abide by section 63 of the GMA, such that building permits would only be issued if the parcel is served by a public water system or if there is an adequate supply of ground water that can be withdrawn without adversely affecting Skagit River Basin instream flows.
¶ 6 The GMA was adopted to combat uncoordinated and unplanned growth.[2] To that end, the act states that citizens, communities, local governments, and the private sector should cooperate and coordinate with one another in comprehensive land use planning.[3] The GMA also mandates that local governments adopt comprehensive plans to protect surface water and ground water resources.[4]
¶ 7 Section 63 of the GMA (codified at RCW 19.27.097) mandates that each applicant for a building permit requiring potable water provide evidence of an adequate water supply.
¶ 8 In April 2001, pursuant to the MOA, a WAC rule setting minimum stream flows for the Skagit River Basin became effective. Its purpose was to retain instream flows in rivers, streams, and lakes in the Skagit area to provide for the protection and preservation of wildlife, fish, scenic, aesthetic, and other *1181 environmental and navigational values, as well as recreation and water quality.[5] This rule was amended in May 2006, reserving specific quantities of surface and ground water which can be allocated for specific future beneficial uses.[6]
¶ 9 The Tribe asserts that despite the commitments enshrined in the MOA, the adoption of the Skagit Basin rule, and the requirements of Section 63 of the GMA, the County has continued to issue permits for wells that are in hydraulic continuity with the Skagit River Basin, resulting in reductions in water flow below the minimum required under chapter 173-503 WAC and Section 63 of the GMA.
¶ 10 The Tribe filed an action for declaratory judgment and injunctive relief against the County barring the County from issuing further building permits that rely on wells in the Skagit Basin in violation of the GMA and the MOA. The Tribe asserted a breach of contract claim against the County for violating the MOA, and a Uniform Declaratory Judgment Act claim against the County for violating RCW 19.27.097 by issuing permits for wells when minimum flow requirements were not met.
¶ 11 The County moved for dismissal. The superior court ruled that the Tribe lacked standing to seek direct enforcement of RCW 19.27.097 (Section 63 of the Growth Management Act), but held that it could seek enforcement pursuant to provisions of the MOA.
¶ 12 Subsequently, the County filed another motion to dismiss and for judgment on the pleadings, asserting that the MOA was contrary to public policy. The superior court dismissed the Tribe's contract claim without discussion.
¶ 13 The Tribe appeals both rulings. The County also appeals a conclusion by the superior court that there is no permitting or metering system in place at the state or local level that regulates exempt well use.

II.
¶ 14 Dismissal under CR 12 should be granted sparingly and with care.[7] For the purposes of such dismissal, the plaintiff's factual allegations are presumed to be true.
¶ 15 The County asserts that the MOA is contrary to public policy and therefore void and unenforceable. It argues that the County cannot grant away its legislative authority or limit its ability to protect the health, safety, and welfare of its population. It further argues that it is prohibited from contractually limiting its governmental capacity when so doing could prevent it from enacting legislation that may become necessary to protect the welfare of its citizens.
¶ 16 Counties are authorized by statute to make such contracts as may be necessary to their corporate or administrative powers.[8] Case law readily provides examples of permissible contracts for the exercise of governmental functions. In State ex rel. Schlarb v. Smith,[9] King County argued a contract requiring it to levy taxes to maintain a dam was contrary to public policy. The court held that the contract was not open to attack on the grounds that it was against public policy, stating that the principle has no application to a contract entered into under specific statutory authority.[10]
¶ 17 Likewise, in Weyerhaeuser v. Pierce County,[11] the court upheld the contracting of an essential government function (handling and disposing of solid waste). The court noted that the collection and disposal of garbage and trash constitutes a valid exercise of police power and a governmental function which may be exercised in all reasonable ways to guard the public health.[12] A government entity may elect to collect and dispose of the garbage itself or it may grant exclusive *1182 collection and disposal privileges by contract.[13]
¶ 18 In Redmond v. Kezner,[14] this court upheld a contract between property owners and a city concomitant to zoning changes, noting that the party challenging an agreement carried the burden of showing that it is an illegal or invalid delegation of government police powers.[15] The Kezner court relied on the holding in State ex rel. Myhre v. Spokane,[16] in which the court rejected the argument that an agreement limiting the future exercise of a municipality's land use power was per se invalid. Instead, the court adopted a balancing test requiring courts to weigh the benefits and detriments to the public of an agreement. Such agreements would be invalid only if they are "clearly arbitrary and unreasonable, and have no substantial relation to the public health, safety, morals, and general welfare, or if the city is using the concomitant agreement for bargaining and sale to the highest bidder or solely for the benefit of private speculators."[17]
¶ 19 Far from being arbitrary and unreasonable, the MOA in the present case has a substantial relation to public health, safety, morals, and general welfare. It represents, not a limitation on the County's legislative and police powers, but a commitment to follow and enforce specific statutory requirements. There is abundant statutory authority to support a conclusion that the MOA is not contrary to public policy. The GMA itself specifies coordinated planning. "It is in the public interest that citizens, communities, local governments, and the private sector cooperate and coordinate with one another in comprehensive land use planning."[18] The GMA mandates county-wide planning in cooperation with cities located within the county.[19] County-wide planning policies (CPPs) are the "framework" by which county and city comprehensive plans are developed under the GMA.[20] The CPP process and framework determines the manner in which the county and the cities agree to all procedures and provisions including but not limited to desired planning policies, deadlines, and ratification of final agreements.[21]
¶ 20 In King County v. Central Puget Sound Growth Management Hearings Board,[22] the court considered whether CPPs must be binding in order to fulfill their purpose under the GMA. Noting that the GMA requires comprehensive plans to be consistent with each other in order to ensure harmonious land use planning, the court held that if the CPPs served merely as a nonbinding guide, municipalities would be at liberty to reject CPP provisions and the CPPs could not ensure consistency between local comprehensive plans.[23]
¶ 21 The MOA directly supports the statutory goals of the GMA of ensuring harmonious land use planning to maintain and enhance natural resource-based industries such as fisheries, to conserve fish habitat, and to protect and enhance the state's water quality and availability.
¶ 22 The Interlocal Cooperation Act allows public agencies to "make the most efficient use of their powers by enabling them to cooperate with other localities on a basis of mutual advantage."[24] In a Skagit County resolution confirming the County's participation in the MOA, the County cites section .030 of the Interlocal Cooperation Act which allows any two or more public agencies to enter into agreements with one another for joint or cooperative action. Under the Act, any one or more public agencies may contract with any one or more other public *1183 agencies to perform any governmental service, activity, or undertaking.[25] A public agency includes Indian tribes, cities, counties, special purpose districts, and agencies of the state government.[26]
¶ 23 Similarly, the Water Resources Act of 1971 encourages coordination between multiple parties to ensure the proper stewardship of the state's water resources.[27]
Through a comprehensive planning process that includes the state, Indian tribes, local governments, and interested parties, it is possible to make better use of available water supplies and achieve better management of water resources. Through comprehensive planning, conflicts among water users and interests can be reduced or resolved. It is in the best interests of the state that comprehensive water resource planning be given a high priority so that water resources and associated values can be utilized and enjoyed today and protected for tomorrow.[[28]]
¶ 24 The MOA entered into by the Tribe and the County comports squarely with the public policy aims of the GMA, the Interlocal Cooperation Act, and the Water Resources Act. Given the manifest legislative intent favoring cooperation and joint planning in the above acts, the MOA is not void as against public policy. We therefore reverse the second order of dismissal entered by the superior court.
¶ 25 We do not reverse the first partial order of dismissal of the Tribe's request for a declaratory judgment regarding enforcement of RCW 19.27.097. We agree that the County is legally required to follow the dictates of that statute. But the Tribe has other avenues of potential relief available to it regarding this issue, and it is clear, given the recent amendments to the instream flow rule and the asserted forthcoming revision of pertinent county ordinances, that the relative positions of the affected parties are in a state of flux. The Tribe may challenge individual permits via Land Use Petition Act appeals, and may seek relief from the Growth Management Hearing's Board regarding new ordinances adopted by the County to comply with the MOA and GMA, or seek such relief regarding a failure to adopt appropriate ordinances.
¶ 26 Given our ruling that the Tribe may seek to enforce the MOA provisions, we do not address the County's appeal, as the issue it raises is likely to be reconsidered in further proceedings on remand.
¶ 27 Affirmed in part, reversed in part, and remanded.
WE CONCUR: AGID and BECKER, JJ.
NOTES
[1] See U.S. v. Washington, 459 F.Supp. 1020, 1049 (1978).
[2] RCW 36.70A.010.
[3] RCW 36.70A.010.
[4] RCW 36.70A.070.
[5] Ch. 173-503 WAC.
[6] WAC 173-503-073(1).
[7] Haberman v. Wash. Pub. Power Supply Sys., 109 Wash.2d 107, 120, 744 P.2d 1032 (1987), 750 P.2d 254 (1998).
[8] RCW 36.01.010.
[9] 19 Wash.2d 109, 141 P.2d 651 (1943).
[10] Smith, 19 Wash.2d at 112-13, 141 P.2d 651.
[11] 124 Wash.2d 26, 873 P.2d 498 (1994).
[12] Weyerhaeuser, 124 Wash.2d at 40, 873 P.2d 498.
[13] Weyerhaeuser, 124 Wash.2d at 40, 873 P.2d 498.
[14] 10 Wash.App. 332, 517 P.2d 625 (1973).
[15] Kezner, 10 Wash.App. at 340, 517 P.2d 625.
[16] 70 Wash.2d 207, 422 P.2d 790 (1967).
[17] Spokane, 70 Wash.2d at 216, 422 P.2d 790.
[18] RCW 36.70A.010 (emphasis added).
[19] RCW 36.70A.210.
[20] RCW 36.70A.210.
[21] RCW 36.70A.210(2).
[22] 138 Wash.2d 161, 979 P.2d 374 (1999).
[23] King County, 138 Wash.2d at 175-76, 979 P.2d 374.
[24] RCW 39.34.010.
[25] RCW 39.34.080.
[26] RCW 39.34.020.
[27] RCW 90.54.010.
[28] RCW 90.54.010(1)(b) (emphasis added).