No. 69          October 27, 2016          497

IN THE SUPREME COURT OF THE
STATE OF OREGON

In re Complaint as to the Conduct of

FREDRIC SANAI,
OSB #981372,
*Accused.*

(OSB 13100; SC S063514)

En Banc

On review of the decision of a trial panel of the Disciplinary Board, dated July 7, 2015.

Argued and submitted on the record on June 15, 2016.

Fredric Sanai, Lake Oswego, argued the cause and filed the briefs for the accused.

Kellie F. Johnson, Assistant Disciplinary Counsel, Tigard, argued the cause and Susan Roedl Cournoyer, Assistant Disciplinary Counsel, filed the brief on behalf of the Oregon State Bar.

PER CURIAM.

The accused is disbarred, effective 60 days from the date of this decision.

## PER CURIAM.

This is a reciprocal discipline review proceeding conducted under Oregon State Bar Rules of Procedure (BR) Title 10 and BR 3.5. Fredric Sanai (the accused) was disbarred by the Washington Supreme Court in June 2013 for misconduct in a variety of matters arising from the dissolution of his parents' marriage in Washington State.[1] Shortly thereafter, the Oregon State Bar (Bar) notified this court regarding the accused's disbarment in Washington State and filed a recommendation for reciprocal disbarment in Oregon as well. Following the accused's response to that recommendation, the court exercised its discretion under BR 3.5(e) to refer this matter to the Bar's Disciplinary Board for the purpose of taking testimony and receiving evidence concerning: (1) whether the Washington disciplinary processes that were provided to the accused had been lacking in notice or opportunity to be heard and (2) whether the accused should now be disciplined by this court. A trial panel convened by the Disciplinary Board subsequently issued a written decision, concluding that the accused should be reciprocally disbarred in Oregon as the result of his misconduct in Washington. The accused now appeals that decision, which we review *de novo*. ORS 9.536(2); BR 10.6. For the reasons set out below, we agree with the trial panel's decision that the accused should now be disbarred in Oregon.

---

[1] The accused was disbarred for violating the following Washington Rules of Professional Conduct (WRPC):

- WRPC 3.1 (filing frivolous claims);
- WRPC 3.2 (delaying litigation);
- WRPC 3.4(c) (knowingly disobeying an obligation under rules of a tribunal);
- WRPC 4.4(a) (embarrassing, delaying or burdening third person);
- WRPC 8.4(a) (violating/attempting to violate Rules of Professional Conduct);
- WRPC 8.4(d) engaging in conduct prejudicial to the administration of justice);
- WRPC 8.4(j) (willfully disobeying court order);
- WRPC 8.4(l) (violating duty or sanction imposed under rules for enforcement of lawyer conduct in connection with disciplinary matter); and
- WRPC 8.4(n) engaging in conduct demonstrating unfitness to practice law).

## I. REGULATORY CONTEXT

We begin with a brief description of the rules governing reciprocal discipline matters. The Bar's Disciplinary Counsel is required to notify this court and the State Professional Responsibility Board (SPRB) upon receiving notice from another jurisdiction that an Oregon attorney has been disciplined in that jurisdiction for misconduct. BR 3.5(a). The SPRB is then required to recommend to this court an appropriate sanction to be applied in Oregon based on the discipline imposed by the other jurisdiction. *Id*. The accused attorney is given an opportunity to respond to the SPRB's recommendation, and the Bar is permitted to reply. BR 3.5(c), (d).

This court then must determine "whether the attorney should be disciplined in Oregon for misconduct in another jurisdiction and if so, in what manner." BR 3.5(e). Our choice of sanction is aimed at vindicating the "judicial authority of this jurisdiction, not of the one in which the earlier discipline occurred[.]" *In re Devers*, 317 Or 261, 265, 855 P2d 617 (1993). As a result, in reciprocal discipline cases, we have an independent obligation to determine an appropriate sanction based upon this state's disciplinary rules. *In re Lopez*, 350 Or 192, 198, 252 P3d 312 (2011).

A decision on whether to impose discipline turns on the answers to two questions. The first is, "[w]as the procedure in the jurisdiction which disciplined the attorney lacking in notice or opportunity to be heard?" BR 3.5(c)(1). The second is, "[s]hould the attorney be disciplined by the court?" BR 3.5(c)(2). The court may—as it did in this case—refer the matter to the Disciplinary Board for the purpose of taking testimony on those two questions. BR 3.5(e).

The reciprocal disciplinary rule, in effect, codifies a basic principle of issue preclusion: an attorney who has had a full and fair opportunity to litigate the charges leading to discipline meted out in another jurisdiction may not relitigate the fact issues already decided. Thus, the accused lawyer may not use a reciprocal disciplinary hearing in Oregon to challenge the accuracy of particular underlying factual findings of the other jurisdiction. *See In re Devers*, 317 Or at 264-65 (determining whether the accused lawyer received

constitutionally sufficient notice and opportunity to be heard in the other jurisdiction); BR 3.5(b) (the order imposing discipline in the other jurisdiction is "sufficient evidence that the attorney committed the misconduct described therein"). Instead, to the extent that the attorney seeks to avoid the factual findings of the other jurisdiction, the attorney bears the burden of proving at the hearing "that due process of law was not afforded the attorney in the other jurisdiction." BR 3.5(f).

## II.  FACTS

The facts are taken from the record generated below, the parties' briefs, and the Washington Supreme Court's decision in *In re Disciplinary Proceeding Against Fredric Sanai*, 177 Wash 2d 743, 302 P 3d 864 (2013). The accused was admitted to the Oregon Bar in 1998 and to the Washington State Bar in 2002. He had, it appears, specifically sought admission to the Washington State Bar for the purpose of aiding his mother in matters related to her divorce in Washington from the accused's father.

In April 2002, the accused's parents had finalized their divorce, with the resulting divorce decree requiring, among other things, that the family home and a vacant lot be sold, with the proceeds to be distributed equally between the accused's mother and his father, a Seattle-based cardiologist and internal medicine specialist. The accused and his older brother—Cyrus Sanai, a California attorney—maintained, however, that their father had concealed significant assets from both their mother and the court. Consequently, the two siblings began representing their mother in proceedings designed to contest the court-ordered property sale and distribution of proceeds.

What followed were years of acrimonious litigation in which the accused and his brother filed a virtual tsunami of motions, subpoenas, petitions, appeals, and new actions in Washington's state and federal courts. Many, if not most, of those undertakings were filed solely to delay the court-ordered sale of the family property noted above or to harass the opposing parties and their lawyers. Because of the large number of those filings, the many different forums in which they were initiated, and the fact that they often

overlapped chronologically, we set out those activities and their respective outcomes by loosely grouping them—as did the Washington Supreme Court—according to the various contexts in which they arose.

A.   *The Vacant Lot Dispute*

In April 2002, shortly after the Sanais' divorce decree was finalized, the accused's mother filed a *pro se* appeal and notice of supersedeas without bond, effectively staying the then-pending sale of the vacant lot property. In June 2002, Washington Superior Court Judge Thibodeau ruled that that conduct had been intended solely to delay and frustrate the court's rulings. He subsequently imposed a $10,000 sanction in attorney fees against mother, disqualified the accused's brother from representing her, and ordered the posting of cash or commercial bonds to stay any future sale of the house, vacant lot, or personal property.

Later that month, the accused made his first appearance as his mother's legal counsel at a hearing in Snohomish County Superior Court. At that hearing, Judge Thibodeau ordered that the stay concerning the sale of the vacant lot be lifted by July 2002, absent the posting of a $50,000 bond. Instead of posting the required bond, however, the accused filed a *lis pendens* notice on the vacant lot, effectively clouding title to that property.

In response, Judge Thibodeau issued three orders in September 2002. First, he disqualified the accused from representing his mother. Second, he (1) ordered the accused's *lis pendens* notice stricken unless stayed by the Washington Court of Appeals; (2) barred the parties from filing any further *lis pendens* notices; and (3) barred any further action to delay the sale of the vacant lot. Finally, the judge imposed a $1,000 sanction against the accused's mother, because the accused had brought, on her behalf, a frivolous motion for a protective order and sanctions.

The accused then filed an appeal of those orders on mother's behalf, although mother appeared to continue as a *pro se* litigant. Subsequently, defying the previous order prohibiting him from further representing his mother, the accused then filed at least seven accompanying motions to

either block the sale of the vacant lot or to challenge his disqualification from representation. All were denied by the Washington Court of Appeals, prompting the accused to file either a "reapplication," a motion to reconsider, or a motion to modify in each case, all of which were similarly unavailing. Due in large part to those appeals, Judge Thibodeau imposed an additional $2,500 sanction against mother in December 2002, citing the "'continuing appeals of every ruling of this court [that are] greatly prolonging the matter and costing substantial attorney fees.'" *In re Sanai*, 177 Wash 2d at 747 (internal citation omitted). Moreover, the judge opined, "[t]he continuing appeals border on the frivolous, and must stop for the benefit of both parties.'" *Id.*

In November 2002, as those matters were developing, a Washington Court of Appeals commissioner denied a motion filed by the accused to overturn the September 2002 order striking the previous *lis pendens* notices filed against the marital property. In February 2003, the Washington Court of Appeals denied the accused's motion to modify that ruling and, shortly thereafter, Judge Thibodeau released the accused's July 2002 *lis pendens* notice.

The accused's brother, however, filed a new *lis pendens* notice that same day, based on a federal action in the Western District of Washington—discussed in greater detail below—that he and the accused had initiated as plaintiffs in December 2002. When that action was transferred to United States District Court Judge Zilly—who was already presiding over another federal matter brought by the accused and others involving the Sanais' divorce—Judge Zilly promptly ordered the release of the February *lis pendens* notice. Approximately three days later, the accused's brother filed yet another, albeit amended, *lis pendens* notice, which Judge Zilly released as well in April 2003. Judge Zilly also ordered the parties "to cease and desist from any further action to delay or obstruct the sale of either [the house or the vacant lot] or filing any further *lis pendens*." *Id.* at 748.

In May 2003, the accused filed a new claim on his mother's behalf, this time in King County Superior Court. In that action, mother sought partition of the same family property that had previously been adjudicated as part of the

Sanais' divorce. Based on the new case that he had just initiated, the accused filed yet another *lis pendens* notice against the property, which he subsequently amended with a new notice in July 2003.

That amended *lis pendens* notice did not escape the attention of the other state and federal entities addressing the Sanais' litigation. In August 2003, Judge Thibodeau held the accused's mother in contempt, imposing $5,000 in sanctions for continuing to obstruct the sale of the vacant lot.[2] Approximately one month later, federal district court Judge Zilly similarly concluded that the new *lis pendens* notice violated his previous order to abstain from such filings, and he imposed contempt sanctions of $3,400 in attorney fees against both the accused and his mother, as well as a $2,500 sanction to be paid directly to the court. Judge Zilly again ordered that no further *lis pendens* notices be filed.[3]

B.  *The Family Home Dispute*

Selling the family home appears to have proved just as contentious as selling the vacant lot. In August 2002, the accused filed a *lis pendens* notice on the house; his brother filed another in March 2003. Shortly thereafter, Judge Thibodeau ordered mother to vacate the home by May 10, 2003, or face sanctions.

As discussed above, in May 2003, the accused then filed the property partition action in King County Superior Court seeking, among other things, to quiet title to the house and lot in mother's favor alone. In September 2003, however, the King County Superior Court ordered a venue change to Snohomish County, noting that the Snohomish County court was still engaged in effectuating the parties' divorce decree.

In November 2003, Judge Thibodeau ordered mother to release all *lis pendens* notices filed against the family home and to use her best efforts to obtain releases of all the other *lis pendens* notices filed by her children. Mother

---

[2] The Washington Court of Appeals would later affirm that sanction in 2005 and award attorney fees to the accused's father as well, citing frivolousness and intransigence as contributing factors.

[3] The Ninth Circuit Court of Appeals affirmed that contempt order in an unpublished 2005 opinion, *Sanai v. Sanai*, 141 Fed Appx 677 (9th Cir 2005).

subsequently complied with that order "under protest," but in May 2005, when the state court authorized acceptance of a pending offer on the family home, the accused's brother filed yet another *lis pendens* notice against the residence. Upon learning that fact, Judge Thibodeau recused himself, explaining that he was no longer capable of impartiality in the matters being litigated by the Sanais. Before doing so, however, he pointedly noted that

> "under no circumstances would I give [mother] any relief in this courtroom. She doesn't deserve it. [The accused and his brother] don't deserve any relief. You can take it all the way to the Ninth Circuit if you want to read that, after I've made this record, that they've acted in bad faith. They've frustrated the entire process of this Court, and under any circumstances, any relief that [mother] would get from any court in my opinion is a windfall. You can quote that to the next judge that's going to hear it."

*See Sanai v. Sanai*, 2005 WL 1593488, 1 n 2 (W.D. Wash) (unpublished) (quoting transcript from state trial court proceeding).

C. *Post-Dissolution Motions and Marriage Dissolution Appeal*

While stalling the sale of the house and lot with the filing of *lis pendens* notices, the accused pursued his mother's appeal of the dissolution decree and filed a series of motions in both the trial court and the Washington Court of Appeals. In the home and vacant lot disputes set out above, the accused had initially filed multiple "emergency motions" related to the dissolution decree. Those motions included various requests for relief, including stays, but all were found to be either frivolous or otherwise without merit.

The accused also filed multiple motions with the trial court seeking sanctions and protective orders, based on an allegation that his father had revealed confidential health information about mother. In August 2002, the accused renewed those allegations in a similar motion tendered to the Washington Court of Appeals. The appellate court denied that motion on the grounds that the matter had to be pursued in the trial court. The accused quickly filed another motion and scheduled a hearing in the trial court. As with

his previous motions, the accused sought a protective order and sanctions based on an allegedly improper disclosure of confidential patient information. This time, however, he targeted his father's former attorney. At the appointed time in September 2002, that attorney appeared, but the accused did not. As a result, the trial court ordered $500 in sanctions against the accused and his mother.

In October 2002, the accused filed additional motions with the Washington Court of Appeals, including a renewed request for a protective order against his father. The resulting court order not only denied the accused's motion but also expressly warned that "counsel is on notice that frivolous motion practice in this court could lead to sanctions." The accused moved to modify that ruling, albeit without success.

Despite that warning—and the previous sanctions that had already been imposed against the accused and his mother—in January 2003, the accused moved in the Washington Court of Appeals for discretionary review of, among other things, the orders (1) disqualifying him from representing his mother and (2) holding his mother in contempt. In referring those motions to an appellate panel for its consideration, one appellate commissioner noted that "the ongoing appellate litigation is spawning inordinate management problems for the trial court, not to mention expenses for the respondent." In March 2003, the Washington Court of Appeals dismissed the accused's motions and, in the process, made its sanctions warning more concrete: "We caution that any future frivolous motions will result in sanctions."

In April 2003, the accused filed the opening brief in mother's appeal from the trial court's marriage dissolution decree. The Washington Court of Appeals denied leave to argue the matter and, in an unpublished December 2003 decision, held the appeal to be frivolous and filed for purposes of delay. The court imposed a $10,000 sanction against his mother.

Mother sought review of that decision in the Washington Supreme Court, and, in March 2004, the accused's brother began inundating the court with a flurry of review-related motions. The court went on to deny review of that matter, as well as all of the accompanying motions,

in November 2004. At the same time, the court imposed a $4,000 sanction against the accused's mother, again for frivolous filings and causing delay.

D.    *Washington Supreme Court Filings and Related Motions*

        In April 2003—at about the same time as he was filing the opening brief in mother's dissolution appeal—the accused also filed a motion with the Washington Supreme Court for discretionary review of the rulings concerning the alleged improper disclosure of his mother's confidential health information. One week later, he followed that motion with another seeking to stay the original trial court order requiring mother to vacate the family home. Shortly thereafter, he filed a similar motion with the Washington Court of Appeals, requesting review of the same trial court order. A Washington Court of Appeals commissioner ruled, however, that the court would not act, absent a showing that the second motion was somehow different from the motion pending before the Washington Supreme Court.

        Despite the fact that his motion to stay the order to vacate was still pending with the Washington Supreme Court, the accused filed yet another motion with that body, this time seeking to revise the trial court's order. The accused's motions, however, were uniformly denied, as was his subsequent request for clarification. In the weeks that followed, the accused continued filing multiple motions with the Washington Supreme Court, among them yet another request for a protective order based on the alleged disclosure of mother's health information—the same claim that had been rejected multiple times by various Washington courts and for which the accused had previously been sanctioned.

        In June 2003, a Washington Supreme Court commissioner ruled that the accused's filings would not be considered by the court, denied the accused's original motion for discretionary review, and dismissed the proceedings. Nevertheless, the accused spent the next several months continuing to file a barrage of motions with the Washington Supreme Court. Finally, in September 2003, the court's chief justice denied all the accused's pending requests—including a motion to modify the ruling denying review—and imposed sanctions of $1,000 jointly and severally on the

accused and his mother. All told, the dissolution case had taken eight years to be resolved in the Washington courts. The Snohomish County dissolution proceedings alone had generated more than 800 docket entries.[4] At about the same time as the dissolution case ended, the Washington Supreme Court forwarded the matter of the accused's conduct to the Washington State Bar Association (WSBA).

E.   *Actions Against Judicial Officers*

Following the Washington Supreme Court's adverse rulings in the matters described above, the accused and his mother filed suit in federal court against the various judicial officers who had ruled against them at both the appellate and trial court levels. In December 2003, the federal district court dismissed the pair's action for lack of subject matter jurisdiction, characterizing it as an "attempt to obtain review of unfavorable decisions of the Washington state courts by wrapping their state law-based challenges in the fabric of federal constitutional claims." The Ninth Circuit Court of Appeals affirmed that judgment in an unpublished 2005 opinion.

The accused also filed an action against the chief justice of the Washington Supreme Court, alleging that the accused's civil rights had been violated in connection with the disciplinary proceedings in Washington. In 2008, the Ninth Circuit remanded that suit for dismissal.

F.   *State and Federal Wiretap Actions, Miscellaneous Claims, and Subpoenas*

Approximately one year before the Snohomish County court's 2002 finalization of the Sanais' divorce, the accused, along with his mother, brother, and two other siblings, began what would become a protracted series of state and federal actions filed against the accused's father, father's Internal Medicine and Cardiology (IMC) practice, and IMC employee McCullough. Those actions alleged, among other things, that father had unlawfully intercepted and recorded various family communications from the IMC Seattle offices. The first such action—filed in Los Angeles County

---

[4] The Washington Supreme Court denied review of the final appellate matter arising from those divorce proceedings in 2010.

Superior Court—was dismissed for lack of jurisdiction. In the second—filed in August 2002 in King County Superior Court—the trial court would eventually conclude that there was no evidence to support the wiretapping claims that the accused had leveled against his father.

In October 2002—despite have recently initiated their King County wiretap action—the accused and his co-plaintiffs sued the defendants in federal court as well, proffering claims of, among other things, illegal wiretapping. In addition to seeking more than $9,000,000 in damages, the accused and his co-plaintiffs also moved for an injunction and attempted to attach the family's vacant lot in an effort to enjoin disposition of that property pending resolution of their federal claims. After district court Judge Zilly denied injunctive relief, however, the accused and his brother filed a second federal wiretapping complaint in December 2002. As already noted above, based on that second action, the accused's brother filed another *lis pendens* notice, violating state court Judge Thibodeau's earlier order to the contrary.

In March 2003, the accused's second wiretapping action was reassigned to Judge Zilly given its similarity to the first action brought by the accused and his co-plaintiff family members. When the *lis pendens* notice arising from that second action came to Judge Zilly's attention, it resulted in the previously noted federal contempt sanction—$2,500 to the court and $3,400 in attorney fees—levied against the accused and his mother.

By June 2003, the accused and his co-plaintiffs had filed a third amended complaint in their federal action. Shortly thereafter, the accused issued a subpoena to the Whatcom Educational Credit Union, signing it as the attorney for plaintiff Ingrid Buron Sanai, the accused's sister. That subpoena sought account statements from 1990 onward for IMC employee McCullough, one of the defendants named in the accused's federal lawsuit. In issuing the subpoena, however, the accused violated the Federal Rules of Civil Procedure by failing to provide prior notice of the subpoena to McCullough's attorney. *See* FRCP 45(a)(4) (requiring subpoenas for the production of documents to be preceded by

notice to the parties before they are issued and served). As a result, Judge Zilly quashed the accused's subpoena in July 2003.

The accused had nevertheless procured a host of other discovery materials by using similar subpoenas in other state and federal courts, a fact that had placed the subpoenas beyond Judge Zilly's jurisdiction to quash. In response, the defendants filed motions for protective orders, which Judge Zilly referred to a federal magistrate.

In October 2003, the magistrate found that a large number of the subpoenas signed and used by the accused had been calculated to harass the opposing parties, rather than to lead to the discovery of relevant evidence. The magistrate then ordered the accused to (1) refrain from issuing any further subpoenas of the kind described in the magistrate's order without prior court approval; (2) return all previously acquired documents to the defendants; and (3) retain no copies of those materials.

The accused proceeded to violate that protective order in several ways. First, he failed to return—and continued to use—documents that he had acquired through improperly issued subpoenas. He explained his actions in that regard by arguing that, "[o]nce Plaintiffs received the discovery, Plaintiffs were free to use it. Magistrate Judge Theiler's order to return the discovery was too late. The cat is out of the bag."

Second, despite the order barring him from issuing similar subpoenas without prior court approval, in October 2004, the accused signed another subpoena as the attorney for his sister. In issuing that subpoena to an insurance company for, among other things, documents containing the names of his father or McCullough, the accused once again violated FRCP 45(a)(4) by failing to provide notice to McCullough's attorney before serving the subpoena.

In January 2005, Judge Zilly granted the defendants' motion for sanctions related to the insurance company subpoena and awarded defendants $1,740 in attorney fees. In doing so, Judge Zilly expressly categorized the accused's failure to provide opposing counsel with advance notice of

the subpoena as "misconduct." In addition, Judge Zilly disqualified the accused from further participating as counsel in the matter.

As noted above, the accused's third amended federal complaint had been filed in June 2003. Like its predecessors, that complaint contained a variety of claims in addition to the wiretapping allegations discussed above, including:

- Libel claims based on bar complaints that the accused's father and his lawyer had filed with the WSBA regarding the accused's conduct as a lawyer. The accused had included a similar claim as part of the wiretapping action filed earlier in King County Superior Court, but the WSBA had subsequently informed the accused that Washington State's Rules for Enforcement of Lawyer Conduct (ELC) barred such claims. *See* ELC 2.12 (providing that communications to the WSBA are "absolutely privileged and no lawsuit predicated thereon may be instituted against any grievant, witness, or other person providing information.") Despite notice of that fact, the accused nevertheless raised the same libel claim again as part of his federal action.

- Claims based on alleged disclosures of mother's confidential health information. As discussed above, the accused's pursuit of those claims at the state level had already resulted in sanctions from both the trial court and the Washington Court of Appeals. The accused nevertheless asserted the same allegations as part of his federal complaint.

- Claims brought under the Employee Retirement Income Security Act (ERISA). The accused originally alleged that IMC had committed ERISA violations against his mother as a beneficiary of IMC's retirement plan and against himself as a "derivative beneficiary." Although Judge Zilly ruled that the accused had no standing to make such a claim for himself, the accused nevertheless continued to assert ERISA-related allegations in his own name.

In November 2003, Judge Zilly granted summary judgment to the defendants on the libel claims noted above citing, in part, the privilege contained in the ELC against lawsuits based on communications to the bar. Nine months

later—in July 2004—Judge Zilly denied the accused and his co-plaintiffs leave to file a fourth amended complaint.

The accused, his brother, and mother responded by filing yet another federal action in the District Court for the Western District of Washington. Their new action was quickly reassigned to Judge Zilly, who dismissed their first two claims as substantially identical to the libel claims that had been previously disposed of on summary judgment in 2003.

For refiling the libel claims, Judge Zilly subsequently imposed sanctions under FRCP 11 of $5,000 each against the accused, his brother, and his mother. *See* FRCP 11(b) and (c) (providing that (1) by presenting pleadings in federal court, attorneys certify that pleadings are not made for improper purpose and (2) sanctions are authorized when rule is violated). In doing so, Judge Zilly stated that the new federal complaint "re-alleges frivolous causes of action that were previously dismissed by the Court. Plaintiffs were aware that this Court had previously rejected their legal and factual arguments, and had the benefit of this Court's prior Orders when drafting [their] new Complaint."

In January 2005, Judge Zilly ordered the accused and his co-plaintiffs to show cause why their continued misconduct should not warrant dismissal of their federal complaints with prejudice. In July 2005, Judge Zilly rejected their arguments and dismissed with prejudice all their remaining federal claims. Noting that the plaintiffs had already been collectively sanctioned around $130,000 in both federal and state courts, Judge Zilly observed that they had nonetheless opted to "persist in their misconduct. Plaintiffs' conduct shows that they will not respond to sanctions. Clearly, no other sanction the Court might impose, except for dismissal itself, would be effective in remedying this misconduct."

In addition to dismissal of those federal claims, in November 2005, Judge Zilly imposed monetary sanctions on the accused, his brother, and his mother totaling $273,437.00. In March 2007, the trio garnered a further sanction: $14,041.50 in attorney fees for the ERISA claims contained in their third amended complaint. Judge Zilly

found that the ERISA claim had been brought in bad faith without any reasonable basis in law or fact.

As in the state-based dissolution case, the volume of filings in the federal court cases was enormous. According to the Bar, the first of the federal cases that the accused and his co-plaintiffs filed compromised by itself 790 docket entries. Judge Zilly described the litigation techniques employed by the accused, his brother, and his mother in their federal court actions as follows:

"Plaintiffs' conduct in this litigation has been an indescribable abuse of the legal process, unlike anything this Judge has experienced in more than 17 years on the bench and 26 years in private practice: outrageous, disrespectful, and in bad faith. Plaintiffs have employed the most abusive and obstructive litigation tactics this Court has ever encountered, all of which are directed at events and persons surrounding the divorce of [the] Sanai[s], including parties, lawyers, and even judges. Plaintiffs have filed scores of frivolous pleadings, forcing baseless and expensive litigation. * * *

"Plaintiffs have flatly refused to obey Orders of this Court, to cooperate with discovery, and to comply with their obligations under the Federal Rules. They have refused to appear for depositions and respond to discovery. When deposing opposing parties, their conduct has been abusive and disrespectful. They have intercepted and wiretapped the phone calls of other represented parties in this litigation. They have actively and improperly interfered with discovery, and required this Court to intervene all too frequently."

*See Sanai v. Sanai*, 2005 WL 1593488, 1 (WD Wash) (unpublished).

In July 2010, the Ninth Circuit issued an unpublished decision affirming dismissal of the plaintiffs' federal claims. *Sanai v. Sanai*, 408 Fed Appx 1 (9th Cir 2010).

G.  *Washington Disciplinary Proceedings*

The Washington State Bar initiated disciplinary proceedings against the accused in 2004, two years after having admitted him to practice in Washington. Following a series of delays, a hearing was finally scheduled for April

2007. Several days before the hearing, however, the accused sought a continuance on the ground that he was suffering from dangerously high blood pressure. Although that condition appeared to have been confirmed in a signed statement from the accused's physician, the hearing officer nevertheless denied the continuance and conducted a full hearing in the accused's absence. The hearing officer would later recommend disbarment for the accused, a recommendation that was unanimously adopted by the Washington State Bar's disciplinary board.

But in 2009, a five-member majority of the Washington Supreme Court reversed that outcome, holding that the hearing officer had abused his discretion in failing to grant the accused's requested continuance. *In re Disciplinary Proceeding Against Sanai*, 167 Wash 2d 740, 225 P3d 203 (2009) (*Sanai I*). Four members of that court, however, joined in a dissenting opinion authored by then-Justice Chambers. In the dissent's view, the hearing officer

> "was fully justified in denying another frivolous motion brought only for the purpose of delay. This was [the accused's] third request for a continuance on a hearing that had already been delayed two years. [The accused's] attempt to delay was not limited to his own discipline case; the record (which the hearing examiner was well aware of when he denied the motion for a continuance) establishes a long standing pattern of delay through myriad tactics, including the filing of frivolous motions for reconsideration and appeal, failing to properly serve documents, refusing to appear for depositions, refusing to produce documents pursuant to orders, and numerous other excuses for his or his client's failure to comply with rules and orders of the courts. These excuses have included automobile collisions, office moves, press of existing motions, a sick mother, and the birth of a child."

*Id*. at 755-756 (Chambers, J. dissenting). The accused's excuses, the dissent continued, might normally warrant judicial sympathy, save for the fact that the accused had already established "an unprecedented record of engaging in abusive and vexatious practices by filing baseless lawsuits and endless motions and appeals (often in direct violation of

court orders) in courts up and down the West Coast." *Id*. at 756.

At the new disciplinary hearing, the accused appeared and testified, and a second disbarment recommendation followed. On appeal, the Washington Supreme Court upheld that recommendation in a written opinion disbarring the accused. *In re Disciplinary Proceeding Against Sanai*, 177 Wash 2d 743, 302 P3d 864 (2013) (*Sanai II*). That opinion set out in detail the various undertakings that, in the court's view, had warranted revoking the accused's license to practice law and offered the following concise summation of the accused's misconduct:

> "Sanai filed multiple frivolous motions and claims for purposes of harassment and delay, repeatedly and willfully disobeyed court orders and rules, brought frivolous suits against judges who ruled against him, and filed similar claims multiple times in multiple jurisdictions for purposes of delay. *** The hearing officer found many of these violations occurred multiple times, were intentional, and caused actual harm."

*Id*. at 746. The accused sought reconsideration, raising essentially the same due process concerns that he now presents to this court. The Washington Supreme Court denied reconsideration in August 2013.

H.  *Oregon Disciplinary Proceedings*

In September 2013, the Oregon State Bar filed notice with this court regarding the accused's disbarment in Washington, and with it, a recommendation for reciprocal discipline—disbarment—in Oregon. The accused's response followed. In the interim, the accused unsuccessfully petitioned the United States Supreme Court for a writ of certiorari in *Sanai II*. *Sanai v. Washington State Bar Association Disciplinary Board*, ___ US ___ 134 S Ct 1324, 188 L Ed 307 (2014).

After considering the disciplinary recommendation and the accused's response, in May 2014, this court referred the matter to the Disciplinary Board for the purpose of taking testimony on two issues: (1) whether the disciplinary procedures afforded the accused in Washington had been

lacking in notice or opportunity to be heard, BR 3.5(c)(1), and (2) whether this court should now reciprocally discipline the accused, BR 3.5(c)(2). The hearing before an Oregon disciplinary trial panel took place in February 2015, and, in July 2015, the trial panel issued its opinion and order. The trial panel determined that the accused (1) had received adequate notice and opportunity to be heard in the Washington disciplinary proceedings and (2) should receive the same sanction in Oregon: disbarment.

## III.   ARGUMENTS ON REVIEW

On review, the accused presents seven assignments of error, arguing that he should not be reciprocally disciplined, by disbarment, in Oregon. Some of his challenges address the propriety of the Washington disciplinary proceedings, including the appeal in *Sanai II*, and some address the Disciplinary Board hearing in Oregon.

The accused notes that, under BR 3.5(1), an attorney responding to a notice of discipline for misconduct in another jurisdiction and a recommendation for reciprocal discipline in Oregon must address whether "the procedure" in the other jurisdiction was "lacking in notice or opportunity to be heard." Judging by the nature of his challenges to the disciplinary proceedings in both Washington and Oregon, and his reliance on *Goldberg v. Kelly*, 397 US 254, 90 S Ct 1011, 252 L Ed 2d 287 (1970), the accused apparently assumes that BR 3.5(1) broadly permits him to make a variety of process-based arguments concerning all the disciplinary proceedings related to this matter. As to the Washington disciplinary proceedings, the accused contends that (1) he was denied a right to confront certain witnesses at his hearing; (2) his appeal did not comport with due process because the Washington Supreme Court denied his motion to file a brief longer than permitted by the appellate rules; and (3) the Washington Supreme Court was not impartial, arguments that are all part of his overarching position that he was not afforded "an opportunity to be meaningfully heard." Further, the accused asserts that the hearing before the Disciplinary Board in Oregon was fatally defective in numerous aspects, from evidentiary rulings to the composition of the Disciplinary Board's panel.

The accused concludes that this court should (1) dismiss this matter altogether and impose no disciplinary sanction in his case; (2) sanction him with something less than disbarment; or (3) order a new hearing before a different trial panel. Not surprisingly, the Bar takes a decidedly different view. It writes:

> "In finding that the Accused should be disbarred here, the Oregon panel noted that the Accused's 'misconduct continued for years unabated, despite numerous admonitions and instructions by a number of judges, and extended even into the reciprocal discipline proceeding, in which the Accused still tried to 'game the system.' The Accused's discipline by the Washington court resulted from fair proceedings that afforded notice and ample opportunity to be heard. Disbarment is clearly warranted by the Accused's record of large scale vexatious conduct, relentless abuse, obstruction, and bad faith."

## A.  *The Oregon Reciprocal Disciplinary Hearing*

We begin with the accused's challenges to the sufficiency of the hearing that he received in Oregon. We begin here because, if, as the accused contends, the proceedings against him in Oregon were fundamentally flawed, then our consideration of his arguments regarding the proceedings against him in Washington would be premature. However, as we explain below, we reject the accused's argument that he is entitled to a rehearing in Oregon.

### 1.  *Improper appointment of trial panel*

The accused contends that he is entitled to a new hearing because the trial panel was improperly constituted. According to the accused, that issue concerns who selected the trial panel and the Bar region from which the members of the trial panel were selected.

As part of the preparations for the accused's disciplinary proceeding, in July 2014, the disciplinary chairperson for Region 4 appointed a trial panel drawn from among Region 4 lawyers to hear arguments in that matter. In reciprocal discipline cases, however, the Bar Rules of Procedure appear to anticipate trial panels appointed by the state chairperson, not a regional chairperson. *See* BR 3.5(g)

(noting that, in reciprocal discipline matters, "[a] trial panel appointed by the *state* chairperson shall make a decision concerning the issues submitted to it") (emphasis added).

In April 2015, several months after the accused's hearing was completed, but before the trial panel issued its decision, the State Disciplinary Board Chair sent a letter to the parties ratifying the appointment of the trial panel members. The letter explained:

"It has come to my attention that a Trial Panel was appointed for the above captioned matter by the Regional Chair, as is standard with Trial Panels. The Bar Rules of Procedure are not clear as to whether the Regional Chair has the right to make such an appointment in a reciprocal discipline case. To the extent there is any concern about a possible procedural error in the appointment of the Trial Panel, I find there was no prejudice to either party by the potential procedural error. Both sides still had the opportunity to exercise any challenges to the Trial Panel in accordance with the Bar Rules."

Shortly thereafter, the accused responded with his own letter objecting to what he described as a "late, post-hearing ratification of the Trial Panel improperly appointed by the Regional Chair."

On review, the accused contends that, under BR 3.5(g), only the state chair was authorized to appoint the trial panel that would hear his reciprocal discipline case. The failure to do so, the accused argues, constituted "structural error," a problem, he maintains, that was compounded by the fact that the trial panel that heard his case was drawn entirely from Region 4 (Washington and Yamhill counties). According to the accused, the panel should have been drawn from Region 7 (Clackamas County), the region where he had lived and worked during this matter.

That procedural misstep, the accused asserts, automatically requires a new trial, even without any demonstration of prejudice to him. He draws that proposition from an observation taken from this court's decision in *In re Hendrick*, 346 Or 98, 107, 208 P 3d 488 (2009):

"[I]f the trial panel was not properly constituted, there is no way to know whether a properly constituted trial panel

would have created the same record, made the same rulings, or construed the evidence in the same way, much less reached the same conclusions that this one did."

Alternatively, the accused continues, he was prejudiced by the improperly constituted trial panel because, in his view, the actions of its members "demonstrated its bias and unwillingness to give the Accused a full and fair hearing."

We begin here by noting that, when the trial panel that heard his case was formed, the accused did not peremptorily challenge, nor challenge for cause, any member's appointment. Neither did the accused object to or otherwise express concerns regarding the make-up of the panel before, during, or at the close of trial. He did not raise concerns in his written closing arguments or in the course of raising objections to the transcript. Indeed, there is no evidence that the accused perceived or believed that the appointed panel members could not or would not conduct a fair hearing of his case. And, on the first day of the hearing, two panel members disclosed on the record that they were personally acquainted or "fairly good" friends with six of the accused's character witnesses.

That scenario stands in stark contrast to the facts underlying *In re Hendrick*, the case on which the accused relies. In *Hendrick*, the disciplinary board chair had denied an accused lawyer's peremptory challenge to a panel member when, after the case's first trial panel had been dismissed due to the equivalent of a mistrial, the disciplinary board chair appointed a new three-person panel. Because the lawyer had already exercised a peremptory challenge when the first panel was appointed, the chairperson refused to allow him a second such challenge with regard to the new panel. On appeal, this court held that the disciplinary chair had erred in doing so because that action had effectively rendered the lawyer powerless to remove any member from the new panel in the absence of cause. Because the lawyer's case was not heard by a properly constituted trial panel, the court reasoned, a new trial before a new panel was warranted.

In this case, to the extent that the trial panel was not properly constituted, any impropriety stemmed solely

from a procedural error, rather than an error—like the error in *Hendrick*—that effectively prevented the accused from removing a panel member that he otherwise had a right to remove. Consequently, we conclude that the appointment of the trial panel here could not have constituted "structural error," because it did not deny the accused any procedural right or otherwise restrict his ability to actively participate in composing a trial panel whose impartiality he could trust.[5]

   2.   *The accused's right to counsel*

   The accused contends that the Oregon trial panel violated his right to counsel when it did not permit his brother to represent him. According to the accused, the attorney he had retained to represent him in this matter unexpectedly withdrew several weeks before the accused's February 2, 2015, trial panel hearing. Several days before the hearing was to begin, the accused filed a motion and completed application for the *pro hac vice* admission of his brother, Cyrus Sanai, to represent him in Oregon.

   In opposing that motion, the Bar noted, among other things, that (1) the accused knew that the Bar intended to call Cyrus Sanai as a witness if he appeared in Oregon, a fact that would necessitate his withdrawal as counsel and raise the likelihood of a lengthy set-over request if Cyrus was allowed to represent the accused, and (2) the California State Bar had filed its own set of nine disciplinary charges against Cyrus Sanai in January 2014. Those charges remained pending up to and through the accused's 2015 Oregon trial panel proceedings.[6] Of those charges, five alleged a failure to report the imposition of judicial sanctions

---

   [5] We note, furthermore, that Region 4 was, in fact, the region in which the accused practiced law and served as Yamhill County legal counsel from 1999 through 2013. As a result, had the state chair appointed the trial panel in this matter, it is likely that the panel would have still been selected from Region 4, given the accused's long-standing professional ties to the area.

   [6] On March 20, 2015—more than a month after the disciplinary proceedings against the accused were completed—the California State Bar dismissed all but one of the charges against Cyrus Sanai. That remaining charge, encouraging the continuance of an action from a corrupt motive of passion or interest, was held in abeyance pending resolution of the action out of which it arose. At the time of this writing, that disciplinary charge remained pending before the California State Bar.

to the California Bar; three alleged conduct involving moral turpitude—interfering with the sale of property out of a corrupt motive, bringing or maintaining frivolous judicial complaints, and altering the service list on a filed pleading; and one alleged that Cyrus Sanai had encouraged the continuance of an action from a corrupt motive, passion, or interest.

The trial panel denied the accused's motion to have Cyrus Sanai admitted *pro hac vice* to represent him. The accused represented himself at his hearing.

The accused now argues that, under the Fifth and Fourteenth Amendments, he possessed a constitutional right to be represented by the attorney of his choice. According to the accused, the United States Supreme Court's decision in *United States v. Gonzalez-Lopez*, 548 US 140, 126 S Ct 2557, 165 L Ed 2d 409 (2006), stands for the proposition that the right to counsel includes the right to have counsel *pro hac vice*. He also relies on *McCuin v. Tex. Power & Light Co.*, 714 F2d 1255 (5th Cir 1983), for the proposition that the Fifth Amendment guarantees civil litigants the right to retained counsel, which ordinarily includes the right to be represented by the counsel of their choosing. Those rights, the accused argues, are particularly salient in this situation, where (1) he had limited time to secure alternative counsel; (2) his brother possessed a unique knowledge of this case; and (3) no good reason existed to deny Cyrus Sanai *pro hac vice* admission in Oregon.

The accused's right to have his brother represent him in this matter was not absolute, as the cases on which he relies note. In *Gonzalez-Lopez*—a criminal case—the Supreme Court did, indeed, hold that the erroneous deprivation of the defendant's right to retain counsel of his choosing qualified as structural error requiring reversal of his criminal conviction. Yet the Court then pointedly observed that

"[n]othing we have said today casts any doubt or places any qualification upon our previous holdings that limit the right to counsel of choice and *recognize the authority of trial courts to establish criteria for admitting lawyers to argue before them.*"

*Gonzalez-Lopez*, 548 US at 151 (emphasis added). The Court recognized that trial courts have wide latitude in balancing

a defendant's right to his or her choice of counsel with, among other things, (1) the needs of fairness; (2) the demands of the trial court's calendar; and (3) the need to ensure that trials are "conducted within the ethical standards of the profession[.]" *Id.* at 152.

The Fifth Circuit Court of Appeals adopted a similar stance in *McCuin*. That court noted, among other things, that civil litigants have a right to be represented by counsel and that that right ordinarily implies a right to retain the lawyers of their choice. *McCuin*, 714 F2d at 1262. The Fifth Circuit added, however, that the right to counsel does not "entail absolute freedom of choice," given, for example, the basic requirement that chosen counsel must be a member of the bar in the forum state. Furthermore, the court continued, compelling interests could override that right:

> "The right to counsel of one's choice may be overridden when 'compelling reasons exist.' The right should be balanced in cases in which it is challenged against the right to 'untainted prosecution of the lawsuit' and *society's need to maintain the highest ethical standards of professional responsibility. It cannot be exercised without thought also to the needs of effective administration of justice.*"

*Id.* at 1263 (footnotes omitted; emphasis added).

As the explanations set out above make clear, the tenets recognized in *Gonzalez-Lopez* and *McCuin* do not, as the accused suggests, militate for an unrestricted right to out-of-state counsel of one's choice. Instead, those tenets—specifically, the broad authority of tribunals to establish criteria for admitting the lawyers who will argue before them and the need to maintain high ethical standards and effective administration of justice—establish that the right to choose counsel may be overridden when chosen counsel is not admitted to the bar of the forum state and has not been admitted *pro hac vice* in accordance with the tribunal's criteria.

In Oregon, this court expressly adopted Uniform Trial Court Rule (UTCR) 3.170 for the purpose of regulating the appearance of *pro hac vice* counsel in this jurisdiction. *See* ORS 9.241 (authorizing Oregon Supreme Court to adopt

such rules). Under that rule, courts or administrative bodies faced with requests for *pro hac vice* admission

> "shall grant the application by order if the application satisfies the requirements of this rule, unless the court or administrative body determines *for good cause shown* that granting the application would not be in the best interest of the court or administrative body or the parties."

UTCR 3.170(3) (emphasis added).

Here, the trial panel was faced with (1) a last-minute application for *pro hac vice* admission of the accused's brother in Oregon; (2) the serious nature of the California disciplinary charges facing the accused's brother at the time of that application; and (3) the likelihood that, even if allowed to represent the accused, the accused's brother could nevertheless be required to withdraw after being subpoenaed as a witness once within this jurisdiction. Given all those factors, we conclude that there was "good cause shown" from which the trial panel could reasonably conclude that, because of the likelihood of undue disruption and delay, it was not "in the best interests" of the tribunal to allow the accused's brother to represent him. According to Oregon's Bar Rules of Procedure, those chairing disciplinary trial panels are broadly authorized to facilitate an efficient and orderly hearing. *See* BR 2.4(h) (describing duties of a trial panel chairperson). Under the circumstances noted above, by denying the accused's motion for the *pro hac vice* admission of Cyrus Sanai, the trial panel chair did nothing more than fulfill that obligation.

### 3.   *Mass admission of exhibits offered by the Bar*

The accused argues that some of the trial panel rulings regarding the conduct of the hearing were incorrect. One of those challenged rulings concerns the admission of the Bar's exhibits.

At the accused's disciplinary hearing, the Bar submitted multiple exhibits drawn from the evidentiary record that had been generated in the accused's Washington State Bar proceedings. Those exhibits—totaling some 4,000 pages—were submitted to the trial panel on a single CD ROM. The accused proffered a blanket objection to the

exhibits, arguing that he had a right to individually examine and contest the admissibility of those documents as necessary. As grounds for his omnibus objection, the accused cited relevance, reliability, lack of foundation, lack of authentication, violation of his right to confront the witnesses against him, lack of opportunity to raise individualized objections, and prejudice to his ability to present a full and fair defense. The trial panel nevertheless admitted those materials into evidence, inviting both the accused and the Bar to tender written objections in post-hearing memoranda to any individual exhibits. The accused, however, opted instead to simply reiterate his blanket objections.

The accused now notes that BR 5.1(a) provides that "[i]ncompetent, irrelevant, immaterial, and unduly repetitious evidence should be excluded at any hearing conducted pursuant to these rules." Building on that foundation, he argues that, by (1) admitting the Bar's exhibits without any preliminary demonstration of relevance, materiality, and the like, and (2) denying him the opportunity to individually object to those exhibits at the time that they were offered, the trial panel erred and, in the process, prejudiced his ability to present a full and fair defense at his hearing. According to the accused, the trial panel's offer of a *post hoc* opportunity to challenge those materials was insufficient to rectify the legal error that occurred at the actual hearing, and it now requires that he receive a new trial.

Several considerations, however, lead us to conclude that that position is not well taken. First, the exhibits were taken from the evidentiary record established in his Washington disciplinary proceedings, and, at the very least, many—if not all—of the Washington exhibits were relevant to whether the accused was afforded due process in those proceedings and whether the accused should be disciplined in Oregon. The accused cites no authority for the notion that the exhibits in question required some additional demonstration of relevance or materiality, and we are unaware of any that would apply to the particular facts of this case.

Second, the accused was not ambushed by those exhibits when they arrived in Oregon, and it is not beyond the pale to suggest that the accused had more than a passing

familiarity with each of them. The accused, moreover, was in a position to object to individual exhibits as needed after the hearing.

Third, as a matter of Oregon law, when parties raise objections in the course of a proceeding, they are obliged to accompany those objections with explanations specific enough and clear enough to ensure that a decision maker can immediately identify, consider, and correct the alleged error if warranted. *State v. Wyatt*, 331 Or 335, 343, 15 P 3d 22 (2000). Failure to adequately do so leaves such arguments insufficiently preserved for consideration on appeal. *State v. Clemente-Perez*, 357 Or 745, 752, 359 P3d 232 (2015).

Here, the accused asserted multiple grounds to underpin his objection to the exhibits proffered by the Bar, but he failed to establish even a cursory nexus between those grounds and any actual exhibit or exhibits. That lack of clarity made it virtually impossible for the trial panel to identify specific errors committed in admitting those exhibits, much less correct them. Because the accused did not attempt to segregate admissible exhibits from inadmissible ones by making specific objections when given the opportunity to do so, the accused's argument below regarding the Bar's exhibits was too vague to render it sufficiently preserved for our consideration on review. *See, e.g.*, *Sproul v. Fossi*, 274 Or 749, 755, 548 P2d 970 (1976) ("when evidence is offered as a whole and an objection is made to the evidence as a whole and is overruled, the trial court will ordinarily not be reversed on appeal if any portion of the offered evidence was properly admissible, despite the fact that other portions would not have been admissible had proper objections been made to such portions of the offered evidence").

### 4.   *The right to confront witnesses*

Much as he had done in his Washington disciplinary proceedings, the accused attempted to subpoena the authors of the opinions and orders that had been submitted as evidentiary exhibits in his Oregon disciplinary proceedings. That effort was unsuccessful. The accused now contends that he was improperly prevented from confronting those witnesses and thereby deprived of a fair hearing in

Oregon. His arguments in that regard essentially mirror the confrontation-related arguments that he presents concerning his Washington disciplinary proceedings. As discussed in greater detail later within this opinion, we reject those arguments as they apply to Oregon's disciplinary proceedings for the same reason that we reject the accused's confrontation arguments regarding his Washington disciplinary proceedings.

Before turning to those Washington proceedings, however, we briefly address a confrontation argument presented by the accused that relies on an early 20th century Oregon bar admission case. In *In re Crum*, 103 Or 296, 301, 204 P 948 (1922), this court stated:

> "In a proceeding of this kind, the applicant is entitled to confront the witnesses, to subject them to cross-examination, and to invoke the protection of the tried, wise, and well-settled rules of evidence.
>
> "It has been written that—
>
> "'It is essential to the administration of justice according to law, that the recognized rules of evidence should be observed in this class of cases as well as in all others.'"

According to the accused, *Crum* stands for the proposition that, in Oregon bar disciplinary proceedings, due process requires the opportunity to cross-examine witnesses whose written statements are used in the course of a disciplinary proceeding.

We note that there was a time when this court's case law embraced the notion that all rules of evidence were applicable in lawyer discipline proceedings. That, however, was more than 90 years ago. Since then, this court has held that, in lawyer discipline proceedings, the essential elements of due process are notice and an opportunity to be heard and to defend "in an orderly proceeding *adapted to the nature of the case* before a tribunal having jurisdiction of the cause." *In re Conduct of Devers*, 328 Or 230, 232, (1999) (emphasis added).

Over the years, changes to the procedures used in disciplinary proceedings have effectively moved those proceedings away from the bright-line proscription against

hearsay evidence set out in the Oregon Evidence Code. Consequently, with regard to evidentiary matters, BR 5.1(a) now expressly embraces *any* probative evidence commonly accepted by "reasonably prudent persons in the conduct of their affairs." As a result, this court has concluded that hearsay evidence meeting that standard is admissible in disciplinary proceedings. *In re Gildea*, 325 Or 281, 296 n 18, 936 P2d 975 (1997); *In re Conduct of Taylor*, 319 Or 595, 602 n 6, 878 P2d 1103 (1994). Thus, even assuming that, as the accused views it, the judicial orders and opinions would constitute inadmissible hearsay under the Oregon Evidence Code, the notion that, under *Crum*, the accused possessed a right to exclude them or, alternatively, to subpoena the judicial officers who had authored them, is simply counter to the otherwise clear rules relied on today by this court in disciplinary proceedings. We reject the accused's contrary argument.[7]

B.  *The Washington Disciplinary Hearing: The Right to Confront Witnesses*

In accordance with BR 3.5(c)(1), the accused challenges discipline based on his conduct in Washington by arguing that he was not afforded due process of law in the Washington disciplinary proceedings. In the accused's view, those proceedings did not provide him with a meaningful opportunity to be heard. We begin with his argument that due process was lacking because he was not permitted to confront witnesses as required by the Confrontation Clause of the Sixth Amendment to the United States Constitution.

At the onset of the accused's second disciplinary hearing in Washington, the hearing officer indicated to the parties that, in resolving evidentiary and other procedural questions, he would make his rulings "based upon the legal principles that disciplinary proceedings are neither civil nor criminal but are *sui generis* hearings intended to determine

---

[7] The accused takes issue with several other rulings of the trial panel regarding prehearing motions, witness lists, and the like; we reject those additional grounds for a new hearing without written discussion. *See* BR 5.1(b) ("No error in procedure, in admitting or excluding evidence, or in ruling on evidentiary or discovery questions shall invalidate a finding or decision unless *upon a review of the record as a whole, a determination is made that a denial of a fair hearing* to either the Bar or the accused has occurred." (Emphasis added.)).

whether a lawyer's conduct should have an impact upon his or her license to practice law." The hearing officer then went on to instruct the parties that

> "[e]vidence, including hearsay, is admissible if in my judgment this is the kind of evidence on which reasonably prudent persons are accustomed to rely in the conduct of their affairs. I may exclude evidence that is irrelevant, immaterial, or unduly repetitious. Where not inconsistent with these principles I shall use the Washington Rules of Evidence and the Washington Administrative Procedures Act."

The Washington State Bar would eventually introduce into evidence a plethora of judicial orders and opinions related to the accused's conduct, almost all of which were admitted over the accused's hearsay objections to the use of each order as substantive evidence. At one point, the accused appeared to broadly argue that he was also entitled either (1) to have the authors of those documents present themselves and explain the decisions contained therein or (2) to have the orders in question excluded from evidence. The accused, however, raised specific confrontation clause objections to only four of those orders, three of which were overruled and one of which was sustained.

The accused also attempted to subpoena several of the judicial officials who had been involved in different aspects of his parents' divorce, among them, a special master in the dissolution case, Washington superior court judge Thibodeau, and federal district court judge Zilly. Those efforts, too, proved unavailing.

On appeal, the Washington Supreme Court held that the accused had failed to preserve the vast majority of his confrontation clause objections and, where those objections had been preserved, the evidence at issue was either not offered for the truth of the matter asserted or the matter in question was so clearly established by other evidence that it rendered any supposed error harmless. *Sanai II*, 177 Wash 2d at 764-65. The Washington Supreme Court also held that, according to the accused's own concessions, the testimony sought from the subpoenaed judges was irrelevant. The court wrote:

In his posthearing motion to reopen the disciplinary proceedings, [the accused] stated that he wanted to cross-examine the judges so that they would 'acknowledge that the new facts create doubt about the correctness of their rulings.' But the correctness of the judicial rulings in the cases upon which these proceedings are based is irrelevant to whether [the accused's] actions violated RPC 3.1, RPC 3.2, RPC 3.4(c), RPC 4.4, RPC 8.4(a), RPC 8.4(d), RPC 8.4(j), RPC 8.4( l ), and RPC 8.4(n). The hearing officer's decision to quash the subpoenas was not error.

*Sanai II*, 177 Wash 2d at 768.

On review, the accused first asserts that his right to confront witnesses was violated in the Washington hearing when he was denied the opportunity to subpoena and cross-examine the judicial officers whose written orders and opinions were admitted into evidence at his disciplinary proceeding. Absent that right of confrontation, the accused continues, that evidence should have been excluded altogether. The accused contends that that is so for several reasons.

First, the accused argues that, under the Washington Supreme Court's decision in *In re Discipline of Deming*, 108 Wash 2d 82, 736 P2d 639 (1987), attorneys who face disbarment must be afforded the same due process rights as criminal defendants, including the right to confront witnesses afforded by the Confrontation Clause. In *Deming*—a judicial misconduct case—the Washington Supreme Court wrote that judges accused of misconduct are entitled to no less procedural due process than individuals accused of crimes and that judges and lawyers facing disbarment are entitled to the same procedural due process protections. *Id*. at 103. The accused contends that, had he been allowed to cross-examine the authors of the adverse orders and opinions addressing his conduct, he could have shown that (1) his father had perpetrated a fraud on the court in the course of the divorce proceedings below; (2) the judges in question were aware of that fraud; and (3) those judges were unwilling to allow the accused to reopen his parents' dissolution proceeding to expose it.

Ultimately, however, the accused's reliance on *Deming* to support his argument regarding confrontation is

misplaced. As a threshold matter, it is important to understand that many of the rights that inure to criminal defendants are largely inapplicable in proceedings such as these, because attorney discipline matters are not criminal prosecutions. In both Oregon and Washington, bar discipline proceedings are *sui generis*—expressly recognized as neither civil nor criminal in nature. *See* BR 1.3; ORS 9.529; ELC 10.14(a) (so stating).

Moreover, the accused overlooks that, seven years after *Deming*, the Washington Supreme Court retreated from its comment that a judge accused of misconduct is "entitled to no less procedural due process than one accused of crime." Writing in a 1994 judicial discipline case—*In re Discipline of Ritchie,* 123 Wash 2d 725, 730, 870 P2d 967 (1994)—the Washington Supreme Court stated:

> "The judge's constitutional arguments are not well-taken, insofar as they are premised on the notion judges in disciplinary proceedings are entitled to the same rights as criminal defendants. The applicable standard is civil in nature. Previous suggestions to the contrary in *In re Deming* were unnecessary to its holding."

(Internal citations omitted.) In short, more than 20 years ago, the Washington Supreme Court disavowed the tenet for which the accused now cites *Deming*.

Next, the accused argues that we should conclude that his confrontation rights were violated in Washington under that jurisdiction's "appearance of fairness" doctrine, which provides that

> "proceedings before a quasi-judicial tribunal are valid only if a reasonably prudent and disinterested observer would conclude that all parties obtained a fair, impartial, and neutral hearing."

*Matter of Johnston*, 99 Wash 2d 466, 478, 663 P2d 457 (1983). According to the accused, his disciplinary hearing in Washington did not meet the standard because, under *Weyerhaeuser v. Pierce County*, 124 Wash 2d 26, 873 P2d 498 (1994), the "appearance of fairness" doctrine requires that, with regard to any document containing facts or conclusions of law used as evidence in a proceeding, the author

of that document may be called to testify concerning its contents—an opportunity that, according to the accused, he was denied.

Like the accused's reliance on *Deming*, however, his reliance on *Weyerhaeuser* is based on a misreading of Washington law. In *Weyerhaeuser*, the plaintiffs had challenged an environmental impact statement prepared by county employees regarding a proposed sanitary landfill. In the course of public hearings on the proposed project, the county hearing examiner had ruled that the plaintiffs were prohibited from calling the authors of the environmental study to testify. The Washington Supreme Court reversed that ruling, citing provisions of the county code. In doing so, Washington's high court made clear that its decision was not predicated on the state's "appearance of fairness" doctrine:

> "Because we decide this issue on the basis that oral cross examination of the county staff is required under Pierce County Code 2.36.090, we do not address the due process and appearance of fairness doctrine arguments."

*Weyerhaeuser* 124 Wash 2d at 31-32. As a result, *Weyerhaeuser* provides no support for the accused's "appearance of fairness" argument.

Accordingly, we reject the accused's argument that the Washington disciplinary hearing did not afford him due process because he was not allowed to subpoena judicial officers and to subject them to cross-examination.

C. *Appeal in* Sanai II

   1.  *The right to be meaningfully heard*

The accused also contends that his appeal before the Washington Supreme Court lacked due process. Specifically, the accused first argues that the Washington Supreme Court denied his due process right to be meaningfully heard when it denied his motion to file an over-length brief.

In his second Washington disciplinary proceeding, the accused filed—with the disciplinary board's permission—an extended 115-page brief. In preparing his appeal to the Washington Supreme Court from the disbarment

recommendation that followed, the accused moved for leave to file a 132-page opening brief and submitted a draft copy of the proposed brief. The court, however, denied that motion, effectively requiring the accused's appellate brief to meet the 50-page limit imposed by Washington Rules of Appellate Procedure (WRAP) 10.4(b).

In the brief that he filed, the accused challenged 180 of the 229 findings and conclusions of the hearing officer, but he provided the required arguments and citation to the record for only one. *Sanai II*, 177 Wash 2d at 760. The Washington Supreme Court declined to consider the other 179 fact-related assignments of error, citing its own case law for the proposition that attorneys challenging such findings in disciplinary proceedings "must argue why the findings are not supported by the evidence and cite to the record in support of the argument." *Id.* at 761. The court noted that "the record of this 14-day proceeding, containing more than 2,300 pages of transcript and nearly 500 exhibits, fully supports the hearing officer's findings and conclusions." *Id.*

According to the accused, it was physically impossible for him to challenge 56 pages of findings while maintaining the 50-page brief limit imposed by WRAP 10.4(b). He contends that he possessed a due process right to present *all* his arguments on appeal and that the court's refusal to allow him adequate space to do that constitutes structural error, as described in *Arizona v. Fulminante* 499 US 279, 310, 111 S Ct 1246, 113 L Ed 2d 302 (1991) (Rehnquist, C. J. dissenting) (noting that structural error is error affecting the framework from within which a trial proceeds, and without which a criminal trial cannot function as a vehicle to determine guilt or innocence).

We note, however, that even the United States Supreme Court routinely rejects requests to extend or waive the page limitations that it has set for documents being filed with the Court. *See, e.g., Michigan v. Clifford* 460 US 1033, 103 S Ct 1421, 75 L Ed 2d 784 (1983) (denying party's request to extend page limits for opening briefs). In the Court's view, such rules do not restrict a party's access to due process but instead help to apportion limited judicial resources and foster more useful and effective advocacy. As the Court has

recognized on numerous occasions, the "process of 'winnowing out weaker arguments on appeal and focusing on' those more likely to prevail . . . is the hallmark of effective appellate advocacy.'" *Smith v. Murray,* 477 US 527, 536, 106 S Ct 2661, 91 L Ed 2d 434 (1986) (quoting *Jones v. Barnes,* 463 U S 745, 751-752, 103 S Ct 3308, 77 L Ed 2d 987 (1983)).

This court has reached a similar conclusion as a matter of state law. In *Pratt v. Armenakis*, 335 Or 35, 40-41, 56 P3d 920 (2002), the court held that, even in a death penalty appeal, a page limit for appellate briefs does not violate various constitutional rights, including the requirements of due process. The court stated that an appellate court has discretion to decide whether the reason offered by the moving party justifies extending the page limit for a brief and by how much, *id.* at 39, and explained:

> "Courts depend on counsel to examine the record, study the applicable law, and analyze the potentially meritorious claims that should be advanced on appeal. The exercise of professional skill and judgment often requires a lawyer to pick and choose among arguments or theories, and a death penalty appeal is no exception to that requirement. *See Smith v. Robbins*, 528 U S 259, 288, 120 S Ct 746, 145 L Ed 2d 756 (2000) (appellate counsel need not (and should not) raise every nonfrivolous claim, but rather may select from among them in order to maximize the likelihood of success on appeal). Effective appellate advocacy requires counsel to make those choices. Counsel's assertions in support of the motion [for an extended brief] do not demonstrate that he analyzed those choices before seeking an extended brief of 260 pages."

*Id.* at 40.

The accused relies on expert testimony from former Washington Supreme Court Justice Sanders that he was prevented from making all of his nonfrivolous arguments in *Sanai II* because of page limits. As explained above, however, the right to be meaningfully heard does not require appellate courts to allow litigants to present every nonfrivolous argument that could potentially be asserted in briefing. We therefore reject the accused's due process argument based on the page limit for his brief in the Washington Supreme Court.

2.   *The right to an impartial tribunal*

The accused also contends that he was denied due process during his appeal in *Sanai II* because the Washington Supreme Court was not impartial. As previously noted, four members of that court dissented in 2009 when that court reversed the disciplinary board's first recommendation to disbar the accused. Before the court heard *Sanai II*, the accused sought, without success, the recusal of those four dissenters on grounds of actual bias. His theory at the time appeared to be that the dissenters had prejudged his new appeal based on their prior receipt of the record generated in his first disciplinary hearing. Ultimately, however, only two of the four dissenters went on to hear the accused's second appeal after one of their number recused himself and Justice Chambers—author of the original dissent—retired in 2012.

Despite the fact that Justice Chambers did not participate in deciding the merits of the accused's appeal in *Sanai II*, on review, the accused offers a complex theory in which Justice Chambers is nevertheless largely responsible for tainting the Washington Supreme Court's decision that disbarred him. To support that proposition, the accused again draws on the declaration and testimony of his expert, former Justice Sanders.

According to the former Washington jurist, the accused's second appeal had to have been assigned to Justice Chambers for its preliminary work-up and analysis. Although Sanders acknowledges that the identities of such "assignment judges" are kept secret, he notes that, when a Washington justice leaves the bench, his or her caseload generally falls to the new incoming justice. He reasons that, because Justice Chambers's replacement authored the opinion disbarring the accused, it is a "certainty" that the matter was initially assigned to Chambers for creation of a predecision memorandum. That fact is important, Sanders continues, because

> "[t]he function of the assignment justice is critical to the appellate process. The assignment justice presents the summary of the record and a discussion of the procedural background and merits of the appeal (or petition for review

in discretionary review cases) to the entire Court. While members of the Court can independently review the appellate record, this is not commonly done and in a case involving a 10,000 page record would almost certainly not be done."

Again drawing on Sanders's declaration, the accused also argues that Justice Chambers's 2009 dissent exhibited a predisposition toward dealing unfairly with the accused. According to the accused, evidence of that bias is most clearly seen in the portion of Justice Chamber's dissent in which he quotes a California Superior Court judge whose scathing criticism was supposedly directed at the accused. *See In re Disciplinary Proceeding Against Sanai*, 167 Wash 2d 740, 756, 225 P3d 203 (2009) (*Sanai I*) (Chambers, J. dissenting) (quoting California trial court judge describing proliferation of "needless, baseless pleadings," in action as contributing to an "outrage" of unwarranted grief and expense). Those comments, however, were directed at his brother Cyrus Sanai, not the accused. The accused appears to consider the misstatement as purposeful and bias-driven, rather than a mistake. Sanders also expressed the opinion that the other justices who joined Chambers's dissent exhibited bias by voting to uphold the accused's disbarment based on evidence presented at a hearing at which the accused did not appear, which Sanders refers to as "ex parte information."

According to the accused, Chambers's participation in the initial review of the record at the outset of the appeal would cause an objective observer to believe that there was a probability of bias in the appeal. And, the accused adds, two of the dissenters from *Sanai I* heard his appeal in *Sanai II* but should have recused themselves. The accused contends that the level of bias on the Washington Supreme Court meets the standard recently set out in *Williams v. Pennsylvania*, ___ US ___, 136 S Ct 1899, 195 L Ed 2d 132 (2016).

We are not, however, persuaded, by the accused's reliance on *Williams*. In that case, the United States Supreme Court concluded that there was an impermissible risk of actual bias when the Chief Justice of the

Pennsylvania Supreme Court,—a former district attorney who had approved the trial prosecutor's request to seek the death penalty in the petitioner's criminal trial—refused to recuse himself in the petitioner's post-conviction relief case. In *Williams*, the Court held that

> [w]here a judge has had an earlier significant, personal involvement *as a prosecutor in a critical decision in the defendant's case*, the risk of actual bias in the judicial proceeding rises to an unconstitutional level.

*Williams*, ___ US at ___, 136 S Ct at 1910 (emphasis added). That holding was based in large part on the Court's concern that

> "an unconstitutional potential for bias exists when the same person serves as both accuser and adjudicator in a case. This objective risk of bias is reflected in the due process maxim that 'no man can be a judge in his own case and no man is permitted to try cases where he has an interest in the outcome.'"

*Id*. at 1905-06 (internal citation omitted).

In this case, there is no evidence in the record demonstrating that any member of the Washington Supreme Court had "significant personal involvement" in prosecuting the disciplinary charges against the accused. The fact that two members of a four-person dissenting minority in the accused's first appeal heard his second disciplinary appeal does not—without more—pose an objective risk of bias under *Williams*.

As for Justice Sanders's expert testimony, which the accused says "stands unrebutted, and unrebuttable" on the issue of the Washington Supreme Court's bias in this matter, it is worth noting that the trial panel in this case found the former jurist's conclusions about bias to be unreliable. It wrote:

> "While this Trial Panel appreciates the insight given by Justice Sanders as to the inner workings of the Washington Supreme Court, we cannot rely on his conclusions. Justice Sanders (who testified by telephone from Hawaii) testified as a retained expert, paid by [the accused] to give his opinion. His opinions as to the claims of due process denial are

> purely speculation, carefully couched in terms of probability and inference. [The accused] bears a burden of proof by evidence, not by the speculation of a paid expert witness. We find that [the accused] has not sustained his burden of proof on the claim of denial of an impartial tribunal."

We agree with that observation and, consequently, do not accord Justice Sanders's testimony concerning legal conclusions any deference. We also note that, his experience on the court notwithstanding, Justice Sanders was absent at the time of the accused's second appeal; thus, his ruminations concerning what may have occurred during the appeal in *Sanai II* are unhelpful here.

In sum, we conclude that the accused was not deprived of due process in the proceedings leading to his disbarment in Washington. And, for the reasons stated above, we agree with the Bar and hold that the accused received full and fair hearings, both in his Washington disciplinary proceedings and in the hearing conducted in this jurisdiction. We also hold that the evidence amply establishes that the accused engaged in misconduct in Washington that was serious and protracted, warranting reciprocal discipline here. We turn now to the question of the proper sanction that should be imposed as a result.

## IV.   SANCTION

"[T]he purpose of a sanction is not to penalize the accused, but to protect the public and the integrity of the profession." *In re Stauffer*, 327 Or 44, 66, 956 P2d 967 (1998). The Bar urges that disbarment is required to protect the public, the courts, and the profession in light of the accused's "proven willingness" to resort to abuse and obstruction and to act in bad faith. The accused, on the other hand, presented testimony from character witnesses at the hearing before the Oregon trial panel and, in arguing the appropriate sanction, writes in his brief on review:

> "The accused does not believe disbarment is warranted, for actions taken over a dozen years ago in the course of a family dispute where he sought to protect his abused mother from a vicious, lying husband who is an acknowledged perjurer. The Accused is not alone in that opinion; numerous judges, government officials, police, and attorneys testified

> before the Trial Panel to his unblemished professional rep-
> utation and record of exemplary public service."

(Internal citations omitted.)

In reciprocal discipline cases, this court has an independent obligation to determine an appropriate sanction based upon this state's disciplinary rules. *In re Lopez*, 350 Or at 198. To do that, we begin by applying the analytical framework set out in the American Bar Association's Standards for Imposing Lawyer Sanctions (ABA Standards). *In re Obert*, 352 Or 231, 258, 282 P3d 825 (2012). In accordance with the ABA Standards, we first consider the duty violated, the accused's state of mind, and the actual or potential injury caused by the accused's conduct. *In re Kluge*, 332 Or 251, 259, 27 P3d 102 (2001); ABA Standard 3.0. We next determine the existence of any aggravating or mitigating circumstances. *Kluge*, 332 Or at 259. Finally, we consider the appropriate sanction in light of this court's case law. *Id*. In fashioning a sanction, our purpose is to protect the public and the administration of justice from lawyers who have not properly discharged their duties to clients, the public, the legal system, or the profession.

With regard to the ethical duty violated by the accused in this matter, the record demonstrates that, by virtue of his conduct in Washington, the accused:

- Violated Oregon Rule of Professional Conduct (RPC) 3.1 by repeatedly bringing legal proceedings or taking other actions in which he asserted positions that lacked a nonfrivolous basis in law or fact.

- Violated RPC 3.4(c) by repeatedly disobeying obligations imposed upon him by the rules of the tribunals before which he appeared.

- Violated RPC 4.4(a) by repeatedly representing his client using means that had no substantial purpose other than to embarrass, delay, harass, or burden third persons.

- Violated RPC 8.4(a)(1) by violating, or knowingly assisting another in violating, the Rules of Professional Conduct.

- • Violated RPC 8.4(a)(4) by repeatedly engaging in conduct prejudicial to the administration of justice.

By engaging in the conduct giving rise to those violations, the accused abused the legal process and violated the duty he owed to the legal system to refrain from such actions. ABA Standards 6.2.

With regard to the mental state accompanying those violations, the ABA Standards provide that a lawyer (1) acts with intent "when the lawyer acts with the conscious objective or purpose to accomplish a particular result" and (2) acts with knowledge when the lawyer acts with "the conscious awareness of the nature or attendant circumstances of the conduct but without the conscious objective or purpose to accomplish a particular result." ABA Standards at 7. Here, the accused acted intentionally when he repeatedly disobeyed court orders and delayed the sale of the real property that was ordered as part of his parents' marriage dissolution. He also acted knowingly in repeatedly filing multiple frivolous claims in both state and federal court without a reasonable basis in law or fact for doing so.

Turning to the question of the potential or actual injury caused by the accused, we begin by noting that, under the ABA Standards, the term "injury" is broadly defined to encompass "harm to a client, the public, the legal system or the profession which results from a lawyer's misconduct." ABA Standards at 7. Here, the accused's misconduct resulted in serious actual injury to his mother who, as his client, was forced to pay tens of thousands of dollars in sanctions and attorney fee awards as a consequence of the accused's representation. The accused's father, forced to incur similarly exorbitant sums in the course of defending against the unnecessary litigation instigated by the accused, also suffered serious actual injury. Third parties—including father's attorney and employee and the chief justice of the Washington Supreme Court—became subjects of the accused's baseless litigation. The accused's misconduct also inflicted serious actual harm upon the legal system, because it forced courts to waste valuable time and resources dealing with the multitude of frivolous matters generated by the accused. And, finally, it harmed the legal profession itself,

by undermining the public's confidence in the integrity of the law.

Under ABA Standard 7.1, disbarment is the presumptive sanction "when a lawyer knowingly engages in conduct that is a violation of a duty owed as a professional with the intent to obtain a benefit for the lawyer or another, and causes serious or potentially serious injury to a client, the public or the legal system." Under ABA Standard 6.21, disbarment is also the presumptive sanction "when a lawyer knowingly violates a court order or rule with the intent to obtain a benefit for the lawyer or another, and causes serious injury or potentially serious injury to a party or causes serious or potentially serious interference with a legal proceeding."

We next consider whether mitigating or aggravating factors might affect that determination. We find several aggravating factors at play here. First, the accused engaged in a large-scale pattern of misconduct that included multiple offenses. ABA Standard 9.22(c) and ABA Standard 9.22(d). Second, he has refused to acknowledge the wrongful nature of his conduct in any meaningful way. ABA Standard 9.22(g). At the end of the day, the accused appears to view his personal culpability in this disciplinary matter as either negligible or else justified by his family's circumstances. And finally, by pursuing a personal agenda at the expense of his parents, Washington's state and federal court systems, and the rule of law, the accused acted with a dishonest or selfish motive. ABA Standard 9.22(b).

As to mitigating factors, three are applicable here: (1) the absence of a prior disciplinary record, ABA Standard 9.32(a); (2) the imposition of other sanctions related to this matter, *i.e.*, the accused's disbarment in Washington, ABA Standard 9.32(k); and (3) the accused's favorable reputation among lawyers and civic leaders in his community. As to the last factor, however, it should be noted that the accused's character witnesses testified that they knew little or nothing about the Washington litigation until after it had concluded.

Had the scope of the accused's misconduct been less extensive and protracted, those factors would have

undoubtedly played a role in mitigating the sanction to be imposed in this case. But the accused's misconduct was not limited in scope. Both pervasive and ongoing, his misconduct stretched out over multiple years and involved multiple incidents, all despite repeated admonitions from the bench to cease such actions. The end result, as we have already noted, was actual harm—serious harm—to almost all involved, including the courts and the legal profession. Having considered the aggravating and mitigating factors together, we are not persuaded that the mitigating elements set out above are weighty enough to warrant a sanction less than disbarment. We turn now to examine how that preliminary determination squares with our own precedents.

As we have noted in the past, case-matching in the context of disciplinary proceedings "is an inexact science." *In re Stauffer*, 327 Or 44, 70, 956 P2d 967 (1998). That is particularly true where, as here, this court's precedents currently lack a perfect analog to the matter before us. That said, our decision in *In re Conduct of White*, 311 Or 573, 815 P2d 1257 (1991), provides a degree of guidance in fashioning an appropriate sanction in this case.

In *White*, the accused lawyer had intentionally and repeatedly violated his duty to the legal system by filing multiple vexatious actions at his client's behest against two defendants who had co-owned a chiropractic practice with the client. Using the legal system to harass the defendants rather than resolve any legitimate dispute, the accused lawyer confided to opposing counsel at one point that the accused lawyer's client intended to "sue [the defendants] in as many different courts for as many different claims as they could think up," the goal being to cause the defendants "as much grief and expense *** as was humanly possible." *Id*. at 578. True to his word, over a five-year period, the accused lawyer filed 15 different actions against the defendants in three different counties. *Id*. at 583.

This court concluded that the accused lawyer in *White* had violated a number of disciplinary rules in force at the time by conduct that included, in part, (1) filing repetitious claims in different counties where such claims were not warranted; (2) filing such claims for the purpose of

harassment; (3) accepting employment from a client knowing that the client intended to use litigation as a means to harass opposing parties; (4) accepting employment from a client knowing that the client intended to pursue unwarranted claims against opposing parties; and (5) making a false statement to a trial court to obtain a postponement. The court also concluded that there were four aggravating factors at work in *White*: (1) multiple offenses, (2) previous discipline (for accepting an excessive fee), (3) false testimony during the disciplinary process, and (4) failure to acknowledge wrongful nature of his conduct. Ultimately, the court concluded that the accused was

> "guilty of numerous violations of the Disciplinary Rules. He engaged in a pattern of inappropriate conduct over a period of five years. That pattern of conduct, coupled with the accused's lack of candor, suggests that disbarment, or a substantial period of suspension, is needed in order to impress on the accused the necessity of complying with the Disciplinary Rules. The appropriate sanction is a three-year suspension."

*Id*. at 593.

This case has some similarities to *White*, absent several of the aggravating factors—prior disciplinary history and false testimony—that were present in that case. Like the lawyer disciplined in *White*, the accused engaged in a large-scale pattern of vexatious, bad-faith litigation over a protracted period of time that caused actual and serious harm, and he acknowledges no wrongdoing whatsoever.

But this case is also unlike *White*. After the accused had filed multiple frivolous, duplicative, bad-faith actions, claims, and motions in multiple jurisdictions, he repeatedly and deliberately violated court orders. And he used the legal process to target, embarrass, and harass not only his father but third parties as well, including individuals associated with his father and members of tribunals who did not rule in the accused's favor. There is no evidence that his acts were driven by anyone other than himself. The sheer magnitude of the accused's repeated misconduct in the Washington and federal cases, coupled with the accused's abject disdain for the rule of law, as exhibited by his actions, are sufficient to

warrant a sanction here greater than that imposed in *White*. After considering the ABA Standards and our case law, we conclude that, to protect the public and the administration of justice in this jurisdiction, the accused should be disbarred in Oregon as a reciprocal sanction for his misconduct in Washington.

The accused is disbarred, effective 60 days from the date of this decision.